# Exhibit 7

## FINRA DISPUTE RESOLUTION

-------------------------------------------------------x
BRET ACKERMAN,               :

            **Claimant,**    :

v.                   :         Arbitration No. 14-02042

ODEON CAPITAL GROUP, LLC, BONWICK :
CAPITAL PARTNERS, LLC, MATHEW  :
VAN ALSTYNE, AND EVAN       :
SCHWARTZBERG,           :

          **Respondents.**   :
-------------------------------------------------------x

## RESPONDENTS' ANSWER AND DEFENSES
## TO CLAIMANT'S STATEMENT OF CLAIM AND COUNTERCLAIMS

Respondents Odeon Capital Group, LLC ("Odeon" or "the Firm"), Bonwick Capital

Partners, LLC ("Bonwick"), Mathew Van Alstyne, and Evan Schwartzberg (collectively

"Respondents") hereby submit the following Answer and Defenses to the Statement of Claim

filed by Bret Ackerman ("Claimant") and expressly deny any allegations not specifically

admitted herein. Respondents further assert counterclaims against Claimant as set forth below.

## I.     INTRODUCTION

Claimant, who earned on average $1.5 million per year as a fixed income trader for

Odeon, complains in this arbitration that Odeon did not properly compensate him for his work.

In doing so, Claimant argues that this Panel should ignore the parties' consistent course of

dealing with respect to how Claimant was paid pursuant to his employment agreement with

Odeon. Claimant worked for Odeon for approximately 33 months (and 33 pay cycles) without

questioning the manner in which the Firm paid him. Only after Claimant was terminated for

insubordination and refusal to follow repeated directives from his supervisor does he seek to

argue an alternative construction of his compensation terms.  The evidence will demonstrate that Claimant's *post hoc* attempts to extort unearned compensation (the proverbial pound of flesh) from Odeon are completely without basis and are due to be dismissed.

Claimant argues that Odeon breached his Agreement and New York's Labor Law by failing to pay him all sales commissions and bonuses he was entitled to receive under the Agreement.  The evidence will show that Claimant was paid all commissions and bonuses required under the Agreement and that Claimant's claims have no merit whatsoever.  To the contrary, the evidence shows that Claimant was significantly *overpaid* under his employment agreement ("Agreement") and should be required to return nearly more than $100,000 in unearned bonuses paid to him during his employment.

Claimant also argues that Odeon and its owners, Van Alstyne and Schwartzberg, somehow conspired with Respondent Bonwick, an entirely separate broker-dealer, to deprive him of compensation by funneling business from Odeon (and away from Claimant) to Bonwick in an attempt to avoid paying commissions and bonuses to Claimant.  The evidence will show not only that this did not happen, but that it would not make any financial sense for Van Alstyne and Schwartzberg to engage in this conduct.  It was in the best financial interest of Van Alstyne and Schwartzberg to keep every deal at Odeon as they owned 100% of the Firm as opposed to their combined 9.4% ownership of Bonwick.  Claimant's claims arising from some alleged arrangement between Odeon and Bonwick are complete red herrings and lack any rational basis.

In a transparent attempt to further cast Odeon in a bad light, Claimant adds several other claims relating to his alleged substance abuse problem and purported sleeping disorder – two conditions Odeon accommodated although they were not required to do so.  Claimant argues that despite allowing him to take 8 weeks of leave for treatment of his substance abuse issues (for

which Odeon paid $30,820), Odeon somehow retaliated against him for using this leave through alleged minor slights and hostile treatment (such as allegedly calling him "lazy"). The evidence will show that Claimant's FMLA retaliation claim is completely baseless and should be dismissed by the panel. Odeon went above and beyond what was required under the FMLA and treated Claimant more than fairly.

Similarly, Claimant's claim that Odeon retaliated against him for requesting an accommodation of his alleged narcolepsy is also without factual or legal basis. Again, Odeon gave Claimant everything he asked for – breaks to take two naps per day and use of a Firm's conference room for taking his naps (which often disrupted or interrupted Firm business being done in that room). Notwithstanding Odeon's willingness to assist Claimant with his alleged impairment, Claimant argues that the same alleged trivialities underlying his spurious FMLA claim also supports a claim for retaliation and discrimination under the ADA. This claim completely fails as the conduct described by Claimant, even if accepted as true, is insufficient to constitute an adverse employment action. Moreover, Claimant cannot demonstrate that any such alleged conduct is causally connected to his request to take naps twice a day.

Perhaps anticipating that the previous two retaliation claims will be correctly rejected by the Panel, Claimant tries yet a third tack – claiming that the alleged adverse treatment he endured in the last months of his employment was retaliation for his complaints about his pay. Again, this claim is completely without merit. Although Odeon concedes that in February 2014, Claimant sought payment on two separate transactions (for which he had no claim for payment), Odeon did not retaliate against him in any respect as a result of these claims. To the contrary, Odeon attempted to resolve this dispute (even though it had no obligation to do so) but Claimant refused to participate in such discussions. Regardless, Odeon's decision to terminate Claimant's

employment was prompted not by his complaints by buy his insubordinate conduct including his repeated refusal to follow the directives of his supervisors. As the evidence will show, this claim is also due to be dismissed.

Finally, Claimant argues that Odeon somehow defamed him by truthfully reporting the circumstances surrounding his termination and by reporting, as required, that Claimant was the subject of an internal investigation at the time of his termination (for trades with customers in his personal account that violated company policy and likely violated FINRA's mark-up guidelines). Claimant's defamation claim fails on multiple grounds. First, Odeon's reports in Claimant's Form U5 are protected by an absolute privilege under New York law and cannot give rise to a defamation claim as a matter of law. Moreover, as is discussed below, Odeon's Form U5 explanation of the nature of its investigation was completely accurate and truthful, thus providing yet another absolute defense to Claimant's defamation claims.

For each of these reasons, which will be explained in greater detail below, each of Claimant's numerous claims are due to be dismissed at the final hearing.

## II.     FACTUAL BACKGROUND

### A.     Background of Odeon, Van Alstyne, Schwartzberg, and Bonwick.

Odeon is a full-service broker-dealer specializing in providing financial services to institutional clients. Odeon was founded in 2008 and has offices in New York (its principal place of business), San Francisco, Los Angeles, and Greenwich, Connecticut. Schwartzberg and Van Alstyne have been the controlling principals and managing members of Odeon at all relevant times, owning a combined 100% of its shares.

Respondent Bonwick Capital Partners is an independent broker-dealer founded in 2012 by Devin Wicker, its President and CEO. Bonwick provides investment banking, trading, and

4

advisory services to institutional clients.  At all relevant times, Wicker owned 90.6% of Bonwick shares.  Schwartzberg and Van Alstyne are passive minority investors in Bonwick, owning 5.5% and 3.9% of its shares, respectively, during the relevant period.   Contrary to Claimant's allegations, Schwartzberg and Van Alstyne are not controlling owners of Bonwick and do not have voting control.  Nor do Schwartzberg and Van Alstyne have managerial control over Bonwick; rather, Wicker has had sole managerial authority over Bonwick since its inception.

     **B.**     **Claimant's Employment with Odeon.**

Odeon hired Claimant in May 2011 as a Senior Vice President.  On May 1, 2011, Claimant executed an Employment Agreement ("Agreement") setting forth the terms and conditions of his employment with Odeon, including the manner in which Claimant would be compensated.  This Agreement remained in effect until January 1, 2014, when Claimant resigned and began performing services as an independent contractor.

In Section III of Claimant's Agreement with Odeon, the parties agreed that Claimant was eligible to earn compensation in the forms of: 1) commission payments based on sales to customers ("sales commissions") and 2) bonus payments generated through trading of Residential Mortgage-Backed Securities ("RMBS bonuses").  *See* Exh. A to Statement of Claim, p. 2.

     **C.**     **Claimant's Sales Commissions Under the Agreement.**

Under the Agreement, Claimant's sales commissions were determined on a trade-by-trade basis.  The percentage commission paid to Claimant depended in part on his gross revenues generated that month and whether Claimant represented one or both sides of a trade.[1]  Claimant's

---

[1] Obviously, every sales transaction Odeon brokered would have a buyer and a seller.  Under the Agreement (and Odeon's general practice), Claimant would be paid double commissions if he had a Firm-acknowledged relationship with both parties to the transaction.  Odeon invested considerable sums in building a proprietary Customer Relationship Management ("CRM") system that identified which

commission rates for one-sided trades ranged from 20% (in months in which he generated less than $200,000 in revenues) to 30% (when his monthly revenues generated at least $2,000,000). (*Id.*). Claimant's commission rate for a transaction doubled if the trade was two-sided. (*Id.*). Claimant would not be entitled to any commission under the Agreement for a trade in which he did not represent one of the parties, even though he might have assisted in putting the trade together in his role as a trader.

### D.    Claimant's RMBS Bonuses Under the Agreement.

Claimant's RMBS bonus provision was also structured so that the amount of the bonus was dictated in part by Claimant's total revenues generated by Odeon from RMBS trading. Under this provision, Claimant would earn a 2.5% bonus on all RMBS revenues up to $500,000 in a given month and a 5% bonus on RMBS revenues exceeding $500,000. (*Id.*). During a month in which Odeon generated $700,000 in RMBS revenues, Claimant would be entitled to a gross bonus of $22,500 -- $12,500 for the first $500,000 ($500,000 x .025) and $10,000 for the $200,000 in excess of $500,000 ($200,000 x .05). Under the Agreement, any sales commissions Claimant earned through RMBS transactions were to be deducted from these bonus payments.

### E.    Payment of Sales Commissions and RMBS Bonuses During Claimant's Employment.

By March 2014, Claimant had been employed by Odeon for approximately 33 months and had been paid Sales Commissions and RMBS Bonuses on 33 separate occasions.

---

salespersons represented Odeon's customers. In most cases, a single salesperson would be assigned as the covering employee for a customer and other customers were shared. All of this information is maintained in the CRM so that Odeon can more easily and consistently track which salesperson(s) was/were entitled to commissions on any given transaction. Moreover, Odeon at all times retained the right to determine which salespersons were entitled to commissions on a particular transaction based in part on who held the relationship but also based on who performed most or all of the work associated with a trade. If Odeon determined that Claimant was the appropriate person to compensate for a particular transaction (because of customer coverage or because of his role in the transaction), then Odeon would compensate Claimant based on the terms of his Agreement.

6

Throughout this time, Odeon calculated and paid Claimant sales commissions and RMBS bonuses using the methods described above. At the end of every month (and often in advance of payroll being processed), Odeon provided Claimant with detailed spreadsheets explaining the calculation for his monthly sales commission and RMBS bonuses.[2]   Odeon, specifically Van Alstyne and Schwartzberg, also spoke with Claimant if he had any questions about his compensation and addressed any potential errors raised by Claimant with respect to the amounts he was paid. At no time during the first 32 months of his employment did Claimant question the methodology used by Odeon in calculating his sales commissions or RMBS bonuses. During this period, Odeon paid Claimant substantial amounts in commissions and bonuses. During 2012 and 2013, Claimant's only two full years of employment, he earned $1.34 million and $1.57 million, respectively.

Although Odeon paid Claimant all sales commissions and RMBS bonuses to which he was entitled, Odeon did make one oversight that resulted in a significant *over*payment of RMBS bonuses to Claimant.   Specifically, Odeon repeatedly neglected to deduct Claimant's sales commissions from the gross amount of the RMBS bonuses calculated under the Agreement. The Agreement clearly provides that Claimant's RMBS bonus would be "reduced by Sales Commissions, if any, paid to [Claimant] on [RMBS] revenues." *See* Agreement, p. 2. Although Claimant now claims he was underpaid on RMBS bonuses throughout his employment, he never pointed out to Odeon that it was failing to deduct RMBS-based sales commissions from his

---

[2] These spreadsheets demonstrated that Claimant's RMBS bonuses were always calculated based on 2.5% rates for all RMBS revenues up to $500,000 in a month and 5% for all RMBS revenues of $500,001 or greater.

RMBS bonuses. Claimant unjustly benefited from these overpayments by receiving in excess of $100,000 in RMBS bonuses he was not entitled to receive.[3]

### F.  Odeon Accommodates Claimant's Substance Abuse Issues by Granting Claimant a Leave of Absence to Seek Treatment.

As Claimant alleges in his Statement of Claim, Odeon granted him a leave of absence in 2013 to allow Claimant to undergo treatment for purported substance abuse. Although Claimant alleges his leave of absence ran from August 5, 2013 to September 23, 2013, this represented only the portion of the leave during which Claimant was in a rehabilitation facility. Claimant's leave period actually began on August 1, 2013 and Claimant missed numerous other dates prior to August 1 for reasons likely related directly to his substance abuse issues.[4] Not only did Odeon permit Claimant to take leave to address his addiction issues, it paid $30,820 for the treatment provided to Claimant (a fact conspicuously missing from Claimant's version of events). During Claimant's leave of absence, Odeon also continued to pay him sales commissions, including commissions for trades executed and closed by other employees during his leave. Despite the fact Claimant was on leave for a significant portion of 2013, he actually was paid nearly $200,000 more that year than he had in 2012.

### G.  Odeon Accommodates Claimant's Alleged Sleep Disorder.

After Claimant returned from his leave of absence for treatment of substance abuse, he informed Odeon that he had been diagnosed with narcolepsy. In his Statement of Claim,

---

[3] Between January 2013 and March 10, 2014, Claimant received $80,818 in RMBS bonus overpayments as the result of the failure to deduct his sales commissions as required under the Agreement. At the time of the filing of this answer, Odeon is still calculating the amount of overpayments received by Claimant between his hire in May 2011 and the end of 2012.

[4] Claimant's work attendance was spotty for much of his employment, particularly so in 2013. Claimant missed many days of work completely and routinely arrived late and left early on days in which he did work. It is impossible for Odeon to know how often Claimant's absences were caused by his substance abuse issues. However, it is virtually certain that Odeon permitted Claimant to work as a result of these issues in excess of the dates he missed during his formal leave of absence.

Claimant correctly acknowledges that Odeon accommodated his alleged narcolepsy by creating a nap room, providing a reclining chair and giving him time to take naps during the day. Odeon continued to provide these accommodations to Claimant throughout the remainder of his employment with the Firm. At no time did Odeon express any animosity toward Claimant, his alleged condition, or the Firm's accommodation of the same.

Claimant incorrectly alleges that in February 2014, Odeon retaliated against him for requesting accommodations by requiring him to attend meetings at 7:45 a.m.. Again, Claimant conveniently omits multiple crucial facts related to these meetings. First, Claimant was expected to lead many of these meetings, especially given his lead role with respect to the marketing of RMBS products.[5] Second, these 7:45 a.m. meetings took place throughout Claimant's employment with Odeon – they were not initiated in February 2014 and certainly were not initiated to try to somehow retaliate against Claimant. Finally, despite Claimant's allegations to the contrary, Claimant never asked for permission to participate in these daily meetings via telephone, much less did Odeon deny Claimant this opportunity. To the contrary, Odeon permitted multiple employees to participate remotely if they were unable to appear in person. Claimant would have been afforded the same courtesy if he ever made such a request (which he did not).

## H.    Claimant Resigns as an Employee of Odeon and Is Retained as an Independent Contractor.

On January 13, 2014, Claimant informed Van Alstyne (verbally and in an e-mail) that he was resigning as an employee of Odeon effective January 1, 2014, thereby terminating the

---

[5] Notwithstanding Odeon's expectation that Claimant would lead many of the 7:45 a.m. meetings, Claimant frequently missed these meetings altogether.

Agreement.[6] (*See* January 13, 2014 e-mail, Exhibit A, hereto).  Claimant asked the Firm to retain him as an independent contractor.  On February 17, however, Claimant asked to be reinstated as an employee and Odeon agreed to this request, reinstating his employment on or about February 19, 2014.  Until the parties could finalize a new employment agreement (and terms), Odeon continued to pay commissions and RMBS bonuses to Claimant in the same manner in which he had previously been compensated.  Van Alstyne and Schwartzberg repeatedly attempted to discuss with Claimant the terms of his new employment and finalize a new agreement (since his prior Agreement terminated at Claimant's initiative when he resigned his employment on January 1, 2014.  However, Claimant dodged these efforts and repeatedly refused to engage in any dialogue with Odeon management about the terms of his new employment arrangement.

I.   **Claimant First Raises Concerns About Alleged Underpayments in a February 17, 2014 E-Mail.**

Despite his repeated contention in his Statement of Claim that he was underpaid commissions and RBMS bonuses *throughout* his employment at Odeon, Claimant did not express any concerns regarding the sales commissions and RMBS bonuses he received until February 17, 2014, nearly three years after he began work at the firm and seven weeks after he terminated the Agreement to become an independent contractor.  In that e-mail, Claimant claimed Odeon had underpaid him approximately $100,000 in commissions on a transaction in May 2013 (three months before Odeon granted him leave for substance abuse) completed by Michael Distenfeld, another salesperson at Odeon.  Claimant also argued that Odeon failed to pay him $47,121 (Claimant claims he demanded $50,000 in his Statement of Claim) for a transaction involving Bonwick in which Claimant did not represent any of the parties to the

---

[6] Odeon does not know why Claimant resigned from his status as employee.

transaction (a prerequisite for payment of sales commissions under the Agreement). In this e-mail, Claimant did not raise any other concerns regarding his compensation, including how his RMBS bonuses were calculated or whether he had been improperly denied or underpaid any other sales commissions aside from the two transactions at issue. (*See* Claimant's February 17, 2014 e-mail, attached as Exhibit B).

## J.     Concerns Arise with Regard to Claimant's Personal Bond Trading.

In his role with Odeon, Claimant, like other employees, was permitted to buy bonds and other investments for his personal account held at Odeon. However, Claimant was required to get permission from Van Alstyne (Chief Compliance Officer) and Schwartzberg (Odeon's Head of Trading) before doing so.[7]

On February 13, 2014 at 2:43 p.m., Claimant purchased in his personal account an RMBS bond from Hartfield (a FINRA broker dealer) for $29,983.66, approximately 39.75% of its face value. On February 14, 2014 at 12:47 p.m., Claimant sold this same bond to a retail customer of Odeon for $37,673.61, an amount equal to 50% of its face value. Claimant enjoyed a profit of $6,940.83 by marking the bond up 25.7% and selling it to the customer. Claimant did not seek

---

[7] Odeon's Compliance and Supervisory Procedures Manual ("Compliance Manual") (which Claimant acknowledged receiving – *see* Exhibit C hereto) provides as follows with respect to personal trading by employees:

> Any trading and investment activities undertaken by employees, either for Odeon or for their own personal accounts must remain in full compliance with the law and highest ethical standards and must avoid even the appearance of impropriety. Accordingly, employees must exercise good judgment when engaging in securities transactions.
> * * * * * * *
> Traders' personal orders require the approval of the designated supervisor prior to entry.
> * * * * * * *
> Also, while Odeon encourages its Associated Persons to develop investment programs, Odeon strongly discourages speculative trading and short-term trading profits.

(Compliance Manual, Exhibit C, Chaps. 8, 9 and 15).

approval from Odeon prior to making these trades, which violated Firm policy requiring fair dealing with customers and potentially violated FINRA's mark-up rules. (*See* FINRA Rule 2121, generally establishing a guideline that 5% is the largest "spread" a broker-dealer can attach to product sold to a customer – Claimant's "spread" exceeded this amount by more than 5 times).

Claimant completed the bond sale on February 14, before the long President's Day weekend. Upon return on Tuesday, February 18, 2014, Van Alstyne noticed the trades on the trade blotter and commenced an investigation into the trade, which led to a broader review of Claimant's personal account trading. As part of Odeon's investigation, Odeon's counsel and Van Alstyne interviewed Ackerman. Based on this investigation, Odeon decided to reverse the trades through Ackerman's accounts and sell the bonds at its (Claimant's) cost to the retail client.[8] Van Alstyne and Ackerman further reminded Claimant that he needed to seek their approval before engaging in any further transactions with clients from his personal account.

After reversing the trades at issue and making its client whole, Odeon kept the investigation open to review Claimant's account documents, trade duplicates, and account statements to see if Claimant had engaged in any other similar trading activity. The investigation was concluded within a few weeks, but remained open at the time of Claimant's termination on March 10, 2014.[9]

---

[8] Odeon's Compliance Manual provides the Firm with "the right to require an Associated Person to rescind or reverse any transaction which is considered to have been improper." (Exh. C, Ch. 9).

[9] In his Statement of Claim, Claimant refers to Odeon's investigation of his improper attempt to profit from Firm clients and alleges that "the trumped up 'investigation' of [Claimant's] personal bond trades was kept open for an inordinate length of time." It is telling that Claimant, who clearly engaged in inappropriate conduct that merited a thorough investigation, would complain about Odeon's attempt to take its compliance obligations seriously by conducting a thorough investigation. Contrary to Claimant's allegations, Odeon's investigation of his conduct was completely independent of the compensation dispute raised by Claimant in his February 17, 2014 e-mail.

### K.      Odeon Terminates Claimant's Employment.

After Odeon restored Claimant's status as an employee upon his February 14, 2014 request (following his January 1, 2014 resignation), Van Alstyne and Schwartzberg told Claimant that they needed to finalize the terms of his new employment arrangement with the Firm.  Claimant repeatedly refused to discuss the terms of his employment and compensation (both disputes relating to past commissions and future compensation) until Odeon closed its investigation arising from Claimant's improper personal trading on February 13-14.  Claimant refused to communicate (verbally or in writing) with his employer about the terms of his employment unless it prematurely ended an investigation of his wrongdoing. See March 6, 2014 e-mail from Claimant, attached as Exhibit D, in which Claimant stated he was "happy to discuss [compensation issues] when your . . . investigation is complete).  Claimant maintained this refusal even when Respondent pointed out to Claimant the inappropriateness of linking the two events.

On March 10, 2014, Van Alstyne spoke with Claimant again about establishing the terms of his new employment relationship (which needed to be reduced to an agreement).  Claimant refused to discuss this subject with Van Alstyne and Schwartzberg.  Van Alstyne then informed Claimant that he was being transitioned into a commissioned salesperson role and could no longer trade for the Firm.  Claimant became very agitated and told Van Alstyne and Schwartzberg that the Firm could not change his role and that Odeon would have to terminate his employment or he would keep trading.  Van Alstyne responded to Claimant that if he could not follow orders, he needed to go home.  Van Alstyne then attempted to walk away, but was chased by Claimant, who yelled "are you firing me"?  Van Alstyne responded that Claimant needed to go home because of his unwillingness to follow a direct order from his Chief Compliance

13

Officer. Claimant continued to ignore Van Alstyne and instead of leaving sat down and started working on his computer. After a few minutes, Van Alstyne escorted Claimant to the elevator and told him that he would keep Claimant apprised of his status.

Before Claimant left, Schwartzberg approached Claimant and Van Alstyne and took all three into a private conference room to try to reason with Claimant. Claimant continued to be belligerent, hostile, and insubordinate in that meeting, and Schwartzberg realized that he could not reason with Claimant. Schwartzberg informed Claimant his employment was being terminated and accompanied Claimant down the elevator.

Following his termination, Odeon completed Claimant's Form U5 and reported, correctly, that at the time of his termination, Claimant was under internal investigation as a result of his personal RMBS bond trades on February 13-14.[10] Odeon also accurately reported the circumstances surrounding his termination. In this arbitration, Claimant alleges that Odeon was malicious in "filing a U5 that was false and damaging to him."

### III.   LEGAL ANALYSIS

Claimant asserts ten separate causes of action against Respondents in his scattershot Statement of Claim: 1) breach of contract against Odeon for alleged underpayment of sales commissions and RMBS bonuses under the Agreement; 2) breach of the covenant of good faith

---

[10] Question 7B on Claimant's Form U5 asked Odeon whether Claimant "[c]urrently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or Violating investment-related statutes, regulations, rules or industry standards of conduct." Odeon correctly responded "yes" and explained further on its disclosure report: "The firm initiated a review of the appropriateness of transactions on February 13 and 14 in which Mr. Ackerman purchased an RMBS bond from a client of the Firm and sold it into his personal account and subsequently sold it back to the Firm in order to sell it to a retail customer of the Firm. With respect to those transactions, the firm determined that the ultimate price charged in the sale to the retail customer was unreasonable based on Mr. Ackerman's contemporaneous cost. The sale and subsequent repurchase of the bond into and out of Mr. Ackerman's personal account was cancelled by the Firm, and the Firm sold the bond to the retail customer at the Firm's contemporaneous cost. The Firm is conducting further reviews of trading in Mr. Ackerman's personal accounts (held at the firm or disclosed and held away from the firm) to determine if any similar trades have taken place. This additional review has not concluded. Mr. Ackerman was terminated for reasons unrelated to the internal investigation prior to the conclusion of the Firm's review."

and fair dealing against Odeon for allegedly diverting RMBS business to Bonwick; 3) tortious interference against Van Alstyne and Schwartzberg for allegedly diverting RMBS business to Bonwick; 4) unjust enrichment against Bonwick for the RMBS business allegedly diverted from Odeon; 5) violation of New York wage laws by Odeon, Schwartzberg, and Van Alstyne; 6) breach of the Agreement by Odeon relating to the notice of termination provisions; 7) disability discrimination and retaliation by Odeon, Van Alstyne, and Schwartzberg in violation of the New York City Human Rights Law; 8) retaliation under the Family and Medical Leave Act against Odeon; 9) retaliation against Odeon under New York Labor Law § 215; and 10) defamation against Odeon arising from its Form U5 explanation for his termination. For the reasons outlined below, Claimant's claims are entirely without merit and are due to be dismissed.

**A.    Claimant's Breach of Contract Claims Against Odeon for Alleged Underpayment of Sales Commissions and RMBS Bonuses Are Due to Be Dismissed.**

Claimant alleges that Odeon breached the Agreement by failing to pay all compensation he was entitled to receive under Section III, which sets forth the terms under which Odeon was to pay sales commissions and RMBS bonuses. Claimant attempts to support this claim through several factual allegations that are demonstrably incorrect. To the contrary, the evidence submitted at the final hearing will conclusively establish that not only was Claimant paid all amounts owed to him under the Agreement, Odeon significantly *overpaid* him because of its failure to make deductions expressly required under the RMBS bonus provisions under the Agreement.

1.    Odeon Paid Claimant All Sales Commissions He Earned Under the Agreement.

Claimant agues that Odeon breached its obligation to pay sales commissions to him in multiple ways, each of which will be shown to be false. First, Claimant alleges that Odeon failed

to provide backup information supporting the sales commissions it paid to Claimant during his employment.   In making this allegation, Claimant ignores the fact that he was provided with a spreadsheet breaking down his commissions on a transaction-by-transaction basis every time he received a commission check on or around the 15th of each month.   Claimant was given the opportunity to review this spreadsheet to determine whether he was paid correctly and to raise to Odeon any concerns he had with the amounts paid.   Aside from Claimant's e-mail in February 2014 asserting that he was underpaid relating to two transactions (one of which occurred in April 2013), Claimant never questioned the accuracy of the payments made to him.   The simple and obvious reason Claimant did not challenge the amounts paid to him is that the sales commissions Odeon paid to him were accurately calculated under the terms of the Agreement.

Next, Claimant argues Odeon breached its obligation to pay sales commissions by deducting expenses from the amounts he was paid.   Again, this claim is completely unsupported. The evidence presented will demonstrate that Odeon did not deduct any amounts from his sales commission payments for expenses.

Claimant also argues Odeon breached his Agreement by failing to honor the terms of a side agreement between Claimant and Michael Distenfeld through which they split their sales commissions on a 50/50 basis.   Claimant's assertions relating to his purported agreement with Distenfeld completely fail to support any claim that Odeon breached the terms of his Agreement. First, Odeon was not a party to, nor did it consent to, the agreement between Distenfeld and Claimant to share their sales commissions.   As such, Odeon had no contractual obligation to honor this purported arrangement.   More importantly, however, the Agreement created no obligation for Odeon to make any payments to Claimant as a result of trades performed by Distenfeld or any other Odeon employee.   The Agreement created obligations arising solely from

16

Claimant's own sales activities, and the evidence will show that Odeon paid Claimant all sales commissions he earned based on his own transactions.

Claimant further claims, without providing any factual support, that Odeon breached the Agreement by failing to pay sales commissions to him for transactions completed during his leave of absence. Again, the evidence will show that this claim is wholly baseless. Odeon did not take Claimant's leave status into account when paying commissions on sales generated from the accounts assigned to him and paid all such commissions to Claimant regardless of whether those transactions settled during Claimant's leave. Obviously, Claimant cannot establish that Odeon breached the Agreement where it paid Claimant all commissions generated from trades Claimant executed.

Finally, Claimant's allegation that Odeon somehow retained "tips" assigned by Claimant to other employees for work they did on transactions for clients assigned to him is completely false. Odeon agrees that in certain circumstances, employees share revenues generated from transactions for relationships assigned to them if, for example, another employee assists with those transactions. Ultimately, however, Odeon retains complete authority to accept or decline the assignment of commissions between employees. In Claimant's case, Odeon agrees that for a period of time, Claimant shared commissions with Distenfeld. However, Odeon absolutely denies Claimant's baseless claim that Odeon retained any amounts Claimant directed to be paid to Distenfeld (or any other employee).

For each of these reasons, Claimant's allegation that Odeon breached the Agreement by failing to pay all sales commissions owed to Claimant completely lacks factual basis and should be dismissed.

2.      Claimant's Breach of Contract Claim Relating to RMBS Bonuses Is Also Due to
        Be Dismissed.

In his Statement of Claim, Claimant argues that Odeon breached the RMBS bonus provisions in the Agreement by: 1) underpaying bonuses (at a 2.5% rate instead of a 5% rate) for the first $500,000 in revenues during those months in which Odeon generated greater than $500,000 in RMBS revenues; 2) improperly excluding certain transactions when calculating RMBS revenues by improperly claiming such transactions did not involve RMBS products; and 3) improperly diverting RMBS business from Odeon to Bonwick.  The evidence presented at the final hearing will demonstrate the frivolous nature of each of these factual assertions underlying Claimant's RMBS bonus-based breach of contract claims.

Claimant's argument that Odeon underpaid RMBS bonuses in the months in which the Firm generated greater than $500,000 in revenues completely misapprehends the governing provision in the Agreement and ignores the clear course of dealing between the parties with respect to RMBS bonus calculations.  Indeed, the fact that Claimant did not assert that Odeon underpaid him with respect to RMBS bonuses until after he was terminated speaks volumes regarding the specious nature of this claim.

As Claimant correctly notes, the applicable section of the Agreement provides:

> B.      **RMBS Bonus** Employee shall earn a monthly bonus on total revenues generated through RMBS trading of the Company, reduced by Sales Commissions, if any, paid to Employee on those same revenues, at 2.5% of total RMBS monthly revenues of the Company if RMBS monthly revenues are below $500,000, and 5.0% of total RMBS revenues of the Company for all monthly revenues at $500,000 and above, payable to the Employee in accordance with the normal payroll practices of the Employer as are in effect from time to time.

The clear and most sensible reading of this provision required Odeon to pay a bonus of 2.5% to Claimant for all RMBS revenues up to $500,000 and to pay 5% for all revenues in excess of $500,000.

More significantly, however, the parties' actual conduct conclusively demonstrates that this interpretation is entirely consistent with the parties' understanding of how RMBS bonuses were to be paid. In each of the 33 pay periods during Claimant's employment, Odeon calculated his RMBS bonus by paying 2.5% on all revenues below $500,000 and 5% on all revenues above $500,000. Moreover, Claimant understood Odeon's methodology for calculating RMBS bonuses and did not raise any concerns or questions, much less did he demand to be paid at a higher percentage rate. Clearly, the parties' course of dealing with respect to RMBS bonuses demonstrates the folly of Claimant's *post hoc* interpretation. Accordingly, to the extent Claimant argues that the provisions governing his entitlement to RMBS bonuses are ambiguous, the parties' actions for a period of 33 months should be considered and strongly support Odeon's interpretation of this section of the Agreement. *See N.Y. State Law Officers Union v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006) (when determining the meaning of ambiguous contract language under New York law, fact-finders "may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract."); *Thomson v. Saatchi & Saatchi Holdings*, 958 F. Supp. 808, 826 (W.D.N.Y. 1997) (finding that a course of dealing may be used to determine the meaning of ambiguous terms in employment contract) *citing* Restatement (Second) of Contract § 223(2) ("Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement"); *Citibank, N.A. v. 666 Fifth Ave. Ltd. P'ship*, 2 A.D.3d 331, 332 (N.Y. App. Div. 1st Dep't 2003) (affirming trial court's interpretation of ambiguous terms in contract and stating, "[i]n view of the ambiguity of the governing lease provisions particularly, the trial court appropriately relied on the parties' course of conduct to determine their intent."); *Viacom International, Inc. v. Lorimar Productions, Inc.*,486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980) ("The practical interpretation of a contract by the

parties, manifested by their conduct subsequent to its formation for any considerable length of time before it becomes a subject of controversy, is entitled to great, if not controlling weight in the construction of the contract.").

Moreover, Claimant's misguided claim that hitting the magical $500,000 revenue mark doubles the bonus rate (from 2.5% to 5%) for the first $500,000 in revenues would lead to illogical results. Using Claimant's reading, if the Firm generated $499,999 in RMBS revenues in a given month, he would be entitled to a bonus of $12,499.75. If, however, the Firm enjoyed $500,001 in RMBS revenues, Claimant would receive a bonus of $25,000.05, resulting in an extra $12,500.30 in bonuses for generating $2 more revenue. Obviously, the parties did not contemplate such an incongruous result. This further demonstrates the illogical nature of Claimant's new interpretation of the RMBS bonus provisions.

Claimant's second ground for arguing Odeon breached the RMBS bonus provisions of his Agreement is even more far-fetched. Specifically, Claimant argues that Odeon's owners, who owned a combined 9.4% of Bonwick, diverted RMBS business from Odeon to Bonwick to avoid paying RMBS bonuses to Claimant. Ostensibly, Claimant believes that Van Alstyne and Schwartzberg somehow had some financial incentive in allegedly moving business from Odeon to Bonwick. Such a belief is easily refuted using basic math. Schwartzberg and Van Alstyne own 100% of Odeon, roughly ten times their combined ownership in Bonwick. Under Claimant's theory, Odeon's owners were willing to pass along deals on which they would be paid 100% at Odeon to instead receive a 9.4% payout at Bonwick, solely to avoid paying Claimant a bonus of 2.5% or 5%. The evidence will show that Odeon did not divert RMBS deals to Bonwick and certainly had no financial incentive to do so. To the contrary, the very fact that

Odeon agreed to double Claimant's RMBS bonus for revenues beyond $500,000 shows that it wanted Claimant to *increase* the Firm's RMBS business.

Moreover, Claimant cannot prove that Odeon breached the RMBS bonus provision even if it did divert RMBS opportunities to Bonwick (which it clearly did not). Nothing in the Agreement would prohibit Odeon from passing along deals to Bonwick if Odeon wanted to do so. Even if taking such action would result in a financial detriment to Claimant, he cannot show that such a loss of income was the result of a breach of the Agreement as the Agreement does not address, much less prohibit, such conduct.

Finally, the evidence will defeat Claimant's argument that Odeon improperly excluded certain RMBS transactions from its calculation of RMBS revenues to avoid paying bonuses on those deals. Odeon consistently applied industry conventions in identifying RMBS transactions and did not try to exclude transactions to avoid paying Claimant. Moreover, the fact that Claimant never challenged Odeon's classification of these investments prior to filing this arbitration is strong evidence that Claimant agreed with Odeon's interpretation of which products were RMBS and which were not. This argument does not support Claimant's breach of contract claim arising from RMBS bonuses.

**B.**     **Claimant's Breach of the Covenant of Good Faith and Fair Dealing Claim Against Odeon and Tortious Interference Claim Against Van Alstyne and Schwartzberg Also Completely Lack Merit.**

In addition to claiming that Odeon breached the RMBS bonus provisions in the Agreement by diverting certain opportunities to Bonwick, Claimant also argues that Odeon breached the covenant of good faith and fair dealing through the same actions, as its alleged conduct "deprive[d] [Claimant] of the fruits of the Employment Agreement with regard to the RMBS Bonus." (Statement of Claim, p. 2). Claimant further contends that Van Alstyne and

Schwartzberg tortiously interfered with Claimant's Agreement with Odeon through their alleged involvement in this shifting of business opportunities from Odeon to Bonwick.  For the reasons described above, this claim is rife with logical holes.

Again, Odeon did not divert RMBS transactions to Bonwick, nor would Van Alstyne and Schwartzberg do so to disadvantage Claimant financially.  As discussed above, both Van Alstyne and Schwartzberg had a financial *dis*incentive to shift deals to Bonwick, where they would make ten cents on the dollar compared to their earnings if the deal remained at Odeon.

Moreover, Claimant's claim that Odeon breached the covenant of good faith and fair dealing fails for a simple reason: an express written agreement already governs the parties' relationship.  It is, indeed, "an elementary principal of contract law that, where there exists an express contract for compensation, an action outside that contract will not lie." *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 507 (2d Cir. 2009).  *See also Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").  Accordingly, Claimant's good faith and fair dealing claim fails for this independent reason.

Claimant's tortious interference claims against Van Alstyne and Schwartzberg also fail under New York law, as: 1) Claimant cannot establish that the Agreement was breached, and 2) Claimant cannot show that Van Alstyne and Schwartzberg acted outside of their capacities as principals of Odeon in procuring any alleged breach of the Agreement.  In order to establish a tortious interference claim, Claimant must show "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third party's breach of the contract without justification, actual breach of the

22

contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney*, 668 N.E. 2d 1370, 1380 (N.Y. 1996).

In order to establish that Schwartzberg and Van Alstyne, as principals of Odeon, were not parties to the contract, New York law requires Claimant to show that these Respondents "acted outside the scope of their authority." *Marino v. Vunk*, 835 N.Y.S. 2d 47 (1st Dep't 2007). Claimant has not alleged, much less could he prove, that even if they had diverted Odeon business to Bonwick, Schwartzberg and Van Alstyne somehow acted outside the scope of their authority in doing so. Both Schwartzberg and Van Alstyne, as principals of Odeon, are parties to the Agreement and cannot tortiously interfere with it as a matter of law.

Finally, as discussed above, any alleged diversion of Odeon business to Bonwick by Schwartzberg and Van Alstyne would not have resulted in a breach of the Agreement as it does not prohibit such conduct in any possible respect. Claimant's failure to show a breach of the Agreement is fatal to his claim that Schwartzberg and Van Alstyne tortiously interfered with it.

### C. Claimant's Unjust Enrichment Claim Against Bonwick Arising from the Alleged Diversion of Odeon Business Completely Lacks Factual or Legal Basis.

Claimant's only claim against Bonwick is that it was unjustly enriched as a result of Odeon's alleged diversion of RMBS opportunities to Bonwick, which Claimant somehow alleges constitutes a breach of the Agreement. As with Claimant's other claims arising from this alleged reassignment of transactions to Bonwick, Claimant's unjust enrichment claim fails as the evidence will show that no such diversion occurred. However, even if Claimant could somehow establish both that Odeon reassigned deals to Bonwick *and* that this reassignment somehow breached the Agreement, Claimant's unjust enrichment claim would nevertheless fail as a matter of bedrock New York law.

To establish a claim for unjust enrichment under New York law, Claimant must allege: (i) a direct relationship with Bonwick; (ii) that Bonwick was enriched at Claimant's expense; and (iii) that it is against equity and good conscience to permit Bonwick to retain the benefits. *Georgia Malone & Co. v. Rieder*, 926 N.Y.S.2d 494 (1st Dep't 2011). Moreover, New York courts have repeatedly held that an unjust enrichment claim requires that plaintiff perform services at the defendant's behest. *Id.* (citing *Ehrlich v. Froehlich*, 72 A.D. 3d 1010, 1011 (2010); *Seneca Pipe & Paving Co., Inc. v. South Seneca Cent. School Dist.*, 63 A.D. 3d 1556 (2009); *Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*, 296 A.D. 2d 103, 108 (2002). Finally, an unjust enrichment claim is due to be dismissed if the evidence fails to "indicate a relationship between the parties that could have caused reliance or inducement." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179, 944 N.E.2d 1104 (N.Y. 2011).

Claimant's unjust enrichment claim against Bonwick fails at virtually every level of analysis. First, Claimant cannot establish that he enjoyed a direct relationship with Bonwick, who was not his employer and had no contractual privity with him. He certainly cannot show that he had the type of relationship with Bonwick that indicated reliance or inducement. Second, it would be entirely inequitable to require Bonwick to return the benefits it allegedly received from the RBMS deals Claimant claims were diverted to Bonwick. To the extent Bonwick received those deals, it was required to perform the work to close those transactions and any revenues it generated from such activities were justly earned. It would be wholly unfair to take those alleged benefits from Bonwick solely because Claimant believes he should have been given the right to perform that work. Finally, Claimant did not perform any services at Bonwick's request. To the contrary, Claimant complains that Bonwick performed services he wished to perform.

For each of these reasons, Claimant's unjust enrichment claim against Bonwick fails as a matter of law and should be dismissed.

**D.    Bonwick, Van Alstyne, and Schwartzberg Did Not Violate New York's Wage Act.**

On pages 6-7, Claimant alleges that Odeon willfully made unlawful deductions from his wages in violation of § 193 of the New York Labor Law. This section prohibits unauthorized deductions from an employee's wages other than those for, *inter alia,* health care, insurance premiums, union dues, charitable contributions, or "similar payments for the benefit of the employee." N.Y. LAB. LAW § 193. Claimant also claims that Odeon, Van Alstyne, and Schwartzberg violated Labor Law § 198 by failing to pay all commissions due to him. Ostensibly, Claimant's Wage Act claims arise from the same discredited allegations that underlie his breach of contract claim discussed at length above.

Claimant's Wage Act claim arising from the sales commissions he believes were underpaid fails, as Claimant cannot show that the commissions he believes he was entitled to receive were earned "wages" as defined under Section 193. This section does not restrict how an employer determines entitlement to commissions or incentive compensation. Rather, it simply imposes restrictions on the types of deductions that an employer can make from wages or commissions already earned. In this case, to the extent Claimant argues he should have been compensated for transactions which did not give rise to commissions under the Agreement (such as sales completed by Distenfeld or for clients whose accounts were not assigned to him), such unpaid sums should not be considered "wages" under New York law as Odeon, through the Agreement, determined Claimant's eligibility for commissions.

To the extent Claimant alleges Odeon, Van Alstyne, and Schwartzberg violated the Wage Act by making improper deductions from his commissions and bonuses, such a claim will also

25

be disproven at the final hearing.  As stated above, Odeon is unaware of any deductions from Claimant's commissions other than those expressly permitted by law.

Finally, even if Claimant could somehow show that Odeon failed to pay him all commissions and bonuses he earned under the Agreement, the evidence shows that Claimant accepted more than $100,000 in payments from Odeon that he was not entitled to receive under the Agreement based on Odeon's unintentional failure to reduce his RMBS bonus amounts by the sales commissions already paid to him.  These overpayments easily exceed any amounts Claimant could possibly claim were improperly withheld or deducted from his pay and should offset any liability Odeon, Van Alstyne, and Schwartzberg could possibly have under the Wage Act.

**E.    Odeon Did Not Breach the Notice Provisions of the Agreement When It Terminated Claimant's Employment.**

Although he does not discuss this claim in the body of his Statement of Claim, Claimant states in his Summary of Claims (p. 2) that he asserts a claim "[a]gainst Odeon, for terminating [Claimant's] employment in breach of the Employment Agreement by failing to comply with the notice provision therein." Ostensibly, Claimant bases this claim on Section IX of the Agreement titled "Notice Period."   In this provision, both Odeon and Claimant "agree that neither shall retire, resign or otherwise terminate Employee's employment with the Employer for any reason without giving the other party two (2) days' prior written notice of the effective date of Employees' retirement, resignation or other termination." (Exh. A to Statement of Claim, p. 5).

Claimant's claim ignores other key provisions of the Agreement.  Specifically, Section VII ("Termination") provides that "[t]his offer of employment is not an employment contract, and does not represent a guarantee of continued employment for any period of time. **Employment with Employer is "employment at will."   Employer or employee may**

26

terminate this Agreement at any time." (*Id.* at p. 3) (emphasis added). Moreover, subsection B of Section IX clearly states that "[t]he employer retains the right to waive the notice requirement in whole or in part, and to terminate Employee's employment-at-will with or without prior notice. During the notice period, the Employer may, in its sole discretion, but is not obligated to, provide Employee with work." (*Id.* at p. 6). The same provision also gave Odeon the right to require Employee to remain away from its premises and not to do any duties on behalf of Odeon. (*Id.*).

To the extent Claimant bases a breach of contract claim on Odeon's failure to provide him with two days' notice of his termination, such a claim fails as the Agreement specifically gives Odeon the right to waive this requirement. Moreover, even if Odeon gave the required two days of notice, it could effectively suspend Claimant and require him to stay at home, which in essence is no different than being terminated. Not only did Odeon have the right to terminate Claimant without notice, Claimant cannot show he was damaged even if Odeon did not enjoy this privilege under the Agreement. Accordingly, this claim is clearly due to be dismissed.

**F.    Claimant's Disability Discrimination and Retaliation Claims Are Completely Without Merit.**

On pages 8-10 of his Statement of Claim, Claimant argues that Odeon violated the New York City Human Rights Law by allegedly discriminating against him on the basis of his alleged sleep disorder and by retaliating against him for requesting an accommodation of the same. Specifically, Claimant alleges that although Odeon accommodated his disability by allowing him to take naps during the work day (a significant accommodation for someone at a trading desk), "it also began to become increasingly hostile to [Claimant] with regard to work conditions." Claimant alleges Odeon increased its scrutiny of his performance and attendance and

demonstrating a "level of hostility that had not been manifest" prior to his request for an accommodation.

Putting aside the issue of whether Claimant's alleged sleep disorder constitutes a disability under New York law, the evidence at the final hearing will show that Odeon never treated Claimant differently or otherwise discriminated or retaliated against him because of his alleged disability and request for an accommodation to the same.  To the contrary, the undisputed evidence will show that Odeon accommodated Claimant's condition without resistance and even established an area for Claimant to take naps during the day.  Odeon denies that it criticized Claimant as "lazy" and further denies that it instituted daily 7:45 a.m. meetings in February 2014 in an attempt to cause Claimant hardship – these meetings occurred every day throughout Claimant's employment and he was regularly asked to lead the meetings because of his role within the Firm.

Finally, even if Claimant could show that Odeon was somehow hostile to him after his request for accommodation, Claimant's retaliation claim would fail because he cannot show he was subjected to a materially adverse employment action by virtue of his alleged treatment.[11] The minor actions described by Claimant in his Statement of Claim amount to no more than petty slights or minor annoyances that simply fail to rise to the level of adverse treatment sufficient to support a disability discrimination or retaliation claim.  *See Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-68 (2006) ("'petty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable

---

[11] To establish a *prima facie* case of retaliation under the ADA, Claimant must show: 1) that he engaged in protected activity (such as a request for an accommodation of his alleged disability), 2) that he suffered an **adverse employment action,** and 3) that his protected activity and adverse employment action are causally connected.  *See Housel v. Rochester Inst. of Tech.*, 2014 U.S. Dist. LEXIS 34646, at *18 (W.D.N.Y. Mar. 17, 2014).

retaliation." Thus, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

Finally, even if Claimant could show the alleged slights he suffered after disclosing his alleged disability and requesting an accommodation somehow constituted adverse employment actions under the ADA (which they clearly do not), Claimant cannot show that any alleged negative treatment he experienced was causally connected to his request for an ADA accommodation.  Claimant has not asserted (nor could he) that Odeon, Van Alstyne, or Schwartzberg expressed any resentment or dissatisfaction arising from his request for an accommodation.  To the contrary, they quickly acceded to his request and provided Claimant with time and a place to take naps during his workday.  Claimant's only evidence that his alleged poor treatment by Odeon following his request for leave is somehow connected to his request for accommodation is that this alleged conduct took place after he requested an accommodation. This fact is simply insufficient to establish the causal connection Claimant must demonstrate to prevail on this claim.  *See Vails v. Police Dep't of the City of New York*, 54 F.Supp.2d 367, 378 (S.D.N.Y.1999); *Wilson v. Reuben H. Donnelley Corp.*, 1998 WL 770555, at *4 (S.D.N.Y. Nov. 2, 1998) ("'*Post hoc ergo propter hoc*' is a logical fallacy that has never been the law of this Circuit.") (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997)).  For this separate reason, Claimant's ADA retaliation claim is due to be dismissed.

### G.   Claimant's FMLA Discrimination and Retaliation Claims Fail as a Matter of Law.

Claimant's assertion that Odeon, Van Alstyne, and Schwartzberg discriminated and/or retaliated[12] against him for exercising his rights under the FMLA parrots his ADA discrimination

---

[12] On pages 8-9 of his Statement of Claim, Claimant alleges that Odeon, Van Alstyne, and Schwartzberg "discriminated" against him because he requested and took FMLA leave.  In his summary of claims on page 2, however, Claimant identifies his claim under the FMLA as a retaliation claim.  Out of an

and retaliation claims in many relevant respects.  In both circumstances, Claimant agrees that Odeon complied with the law with respect to his requests for assistance.  With respect to the FMLA, Claimant asked for leave to receive treatment for substance abuse Odeon granted the leave and even paid $30,820 for Claimant's treatment.  As with Claimant's ADA narrative, it was only after Odeon met its statutory burden under the FMLA (by providing leave and treatment for his substance abuse problem) that Claimant argues that Odeon, Van Alstyne, and Schwartzberg allegedly began retaliating.

Setting aside the trivial inconveniences Claimant uses to bolster his ADA discrimination and retaliation claims (which fail to give rise to potential liability as a matter of law[13]), the only additional factual allegation Claimant asserts in support of his FMLA retaliation claim is  the vague claim that Odeon failed to pay some portion of the sales commissions Claimant believes he earned during his leave of absence.  Although Claimant argues that Odeon failed to pay him as required under the Agreement, he does not identify which amounts were allegedly wrongfully withheld or the amounts he believes he was improperly denied.  Regardless, as is discussed above, Claimant's allegation that Odeon withheld payment for transactions during his leave which triggered payment obligations under the Agreement is completely false.  To the contrary, the evidence will conclusively show that Odeon paid Claimant for all trades made during his leave by customer accounts assigned to him – including those which settled during Claimant's leave.  Claimant's allegation does not support his retaliation claim.

---

abundance of caution, Respondents will address both types of claims as if Claimant intended to assert both.

[13] As with the ADA, to establish a *prima facie* case of retaliation under the FMLA, Claimant must establish that he suffered an adverse employment action. *See Housel, supra* at 18. In determining whether a plaintiff has suffered an "adverse employment action," the Second Circuit Court of Appeals has expressly adopted for use in FMLA cases the *Burlington Northern* standards for determining adverse employment actions, including the requirement that such actions be more than "petty slights or minor annoyances." *See Millea v. Metro-North R.R. Co.,* 658 F.3d 154, 164 (2d Cir. 2011).

Finally, as with his ADA retaliation claim, Claimant has failed to identify any evidence suggesting that his protected activity – his request for FMLA leave – was causally connected to the alleged mistreatment Claimant claims he experienced during and following his leave.  This failure is fatal to Claimant's FMLA claims.

Claimant's failure to support his FMLA discrimination and retaliation claims with any allegations other than misstatements about alleged denial of compensation during his leave and general minor hostile treatment following his return is fatal.  Accordingly, these claims will be due to be dismissed at the close of the final hearing.

**H.      Claimant's Wage Act Retaliation Claims Are Due to Be Dismissed.**

In his summary of claims on page 3 of his Statement of Claim, Claimant cursorily states that Odeon, Van Alstyne, and Schwartzberg unlawfully discriminated against him in violation of Section 215 of the New York Labor Law by "unlawfully discriminating against [Claimant] in the terms and conditions of his employment (including by initiating and slowing the pace of a regulatory investigation that would not otherwise been initiated), in terminating his employment, and unlawfully penalizing him by filing a false and damaging U5 upon his termination . . . because Ackerman complained to Odeon that it failed to pay him the wages due to him."  Aside from this statement in his case summary, Claimant provides no further factual allegations or legal explanation supporting his retaliation claim under Section 215.  Regardless, the evidence will show that Claimant's retaliation claim under New York law lacks legal footing and should be dismissed.

Section 215 of the New York Labor Law provides that an employer cannot discharge or otherwise discriminate against an employee who expresses a belief that the employer has

violated the State's labor laws.[14]    Although Claimant does not specifically identify which provision(s) of the Labor Law he believes Odeon violated, Respondents assume Claimant will argue that he complained about unpaid wages he believes were owed to him.  As set forth above, Claimant's complaints about unpaid commissions during his employment comprise two separate claims he first raised on February 17, 2014: that he was owed $47,212 for a Bonwick transaction (for which he did not represent any of the parties) and $100,000 on a transaction Distenfeld conducted (not Claimant).

Claimant's Section 215 retaliation claim fails as a matter of law, as he cannot present any evidence that his complaints regarding underpayment for two separate transactions (neither of which created a payment obligation on the part of Odeon) were causally connected to Odeon's initiation of its investigation into Claimant's inappropriate personal trades (which began upon Van Alstyne's discovery of Claimant's conduct on February 18, 2014), Odeon's decision to terminate Claimant on March 10, 2014 based on his insubordination and repeated refusal to comply with management directives, or Odeon's truthful statement in Claimant's Form U5 that he remained under investigation at the time of his termination.

Odeon initiated each of these actions as the direct result of inappropriate conduct by Claimant completely unrelated to Claimant's complaints that he was not paid for the two transactions at issue.  Odeon's investigation into Claimant's trading activity in his personal account and his ultimately unsuccessful attempt to extract an improper profit from an Odeon customer began *immediately* after Odeon discovered this conduct.  Odeon, which takes its compliance obligations very seriously, thoroughly investigated this claim and did not take an

---

[14] The applicable provisions of Section 215 provide in relevant part: "[n]o employer or his or her agent, or the officer or agent of any corporation . . . shall discharge, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, that the employer has violated any provision of this chapter . . . ."

inappropriate amount of time in doing so. In fact, FINRA is still investigating Claimant's trading activities today, *more than six months* after it learned of Claimant's conduct. Simply put, Claimant's complaints about Odeon's investigation of his conduct cannot support his farfetched retaliation claims under Section 215.

Similarly, the evidence will show that Odeon's decision to terminate Claimant was wholly unrelated to Claimant's baseless demands to be paid on the two transactions at issue. To the contrary, Claimant was terminated as a direct result of his insubordinate refusal to follow the directive of Van Alstyne, his superior, to go home after he refused to comply with other management directives. On that occasion, Claimant acted in an openly hostile and belligerent manner toward his direct supervisors, causing them to terminate Odeon's at-will employment relationship with Claimant. Again, this decision does not support Claimant's retaliation claim.

Finally, Odeon's truthful statements in Claimant's Form U5 – both regarding its ongoing investigation of Claimant's conduct and its reasons for terminating Claimant – were made as a result of Odeon's regulatory obligation to be candid and forthcoming when reporting to FINRA on these issues. Indeed, FINRA's interpretive guidance provides that in stating the reason(s) for an employee's termination, a broker-dealer cannot be vague or cursory in its description nor can it sugarcoat the facts. Instead, it must provide a detailed and accurate explanation of why the employee is terminated:

> A firm must provide sufficient detail when responding to Form U5 questions such that a reasonable person may understand the circumstances that triggered the affirmative response. **For example, for purposes of Section 3 on Form U5, it is not sufficient for a firm to report only that a person's registration was terminated because that person violated "firm policy."** If a firm is obligated to report that a registered person was terminated because he or she violated a firm policy, **the firm must identify the policy, provide sufficient facts and circumstances to enable the reader to understand what conduct was involved,** and review other questions on the form to determine whether an affirmative response to any other question is required.

FINRA Notice to Members 10-39 (September 2010) (emphasis added).  This Notice further reminds brokerage firms that they "may be subject to administrative and civil penalties for failing to provide complete and accurate information on Form U5 in a timely manner."

As demonstrated above, Claimant cannot establish that Odeon's Form U5 reporting was intended to retaliate against him for his complaints regarding alleged underpayment of commissions.  Odeon had a regulatory duty to report both the pendency of its investigation and the true reasons for Claimant's termination.  Odeon's truthful U5 reporting regarding Claimant's separation cannot support his Section 215 retaliation claims (or any of his other retaliation claims, for that matter).

## I.   Claimant's Defamation Claim Fails for Numerous Reasons.

Claimant bases his claim solely on his Form U5, in which Claimant asserts Odeon made "false and damaging" statements regarding Claimant and his termination.  Claimant's defamation claim arising from his Form U5 is completely barred, as the challenged statements were subject to an **absolute privilege** under New York law.  *See Cicconi v. McGinn, Smith & Co., Inc.*, 2005 NY Slip Op. 10050, at 4 (N.Y. App. Div. 2005) ("statements made in a Uniform Termination Notice for Securities Industry Registration (Form U-5) *enjoy absolute immunity*.") (emphasis added).  The New York Court of Appeals recently explained the rationale for providing such complete protection to Form U5 statements in *Rosenberg v. Metlife, Inc.*, 8 N.Y.3d 359 (N.Y. App. Ct. 2007), *aff'd* 493 F. 3d 290 (2d Cir. 2007).  In *Rosenberg*, the court noted that "as a security association, the NASD [now FINRA] is a quasi-governmental entity that has been delegated authority to enforce the requirements of the Exchange Act and is the primary regulatory of the broker-dealer industry." *Id.* at 368.  In finding that statements made on a Form U5 are protected by an absolute privilege, the Court held:

> The Form U-5 plays a significant role in the NASD's self-regulatory process. Filing is mandatory within 30 days of termination of the registered representative and firms are subject to penalties should they fail to comply...the compulsory Form U-5 can be viewed as a preliminary or first step in the quasi-judicial process...The Form U-5's compulsory nature and its role in the NASD's quasi-judicial process, together with the protection of public interests, lead us to conclude that statements made by an employer on the form should be subject to an absolute privilege.

*Id.* at 367. *See also Herzfeld & Stern, Inc. v. Beck*, 572 N.Y.2d 683, 175 A.D.2d 689 (N.Y. App. Div. 1991) (holding Form U5 statements are protected by an absolute privilege); *Cicconi v. McGinn*, 808 N.Y.S.2d 604, 607 (N.Y. App. 1st Dep't 2005) (same).

New York courts have consistently and forcefully attached an absolute privilege to Form U5 entries by brokerage firms and have dismissed defamation claims arising from such disclosures. New York law clearly provides that Claimant cannot succeed on his Form U5 defamation claim, and this claim must be dismissed as a matter of law.

Moreover, even if Odeon's Form U5 statements were not absolutely privileged (which they clearly are), Claimant's defamation claim would nonetheless fail as every statement contained in Claimant's Form U5 is absolutely true. There is no dispute that at the time he was terminated, Claimant was under internal investigation (that subsequently turned into a FINRA investigation) into his personal trading activities. Odeon was required to report this investigation and to provide details regarding Claimant's conduct, and its reports were completely truthful. Similarly, Odeon had a duty to report the circumstances resulting in Claimant's termination completely and candidly. Again, Odeon met its regulatory burden by providing the truthful reason it terminated Claimant's employment. As a result, Claimant's defamation claim would fail as a matter of law even if it were not barred by an absolute privilege under New York law.

## IV.   CONCLUSION

Based on the foregoing, Claimant's claims should be denied, and he should recover nothing from this proceeding.

## AFFIRMATIVE AND/OR ADDITIONAL DEFENSES

By way of further Answer to Claimant's Statement of Claim, Respondents set forth the following defenses:

1. Claimant's claims are barred, in whole or in part, because they fail to state a cause of action upon which relief may be granted.

2. Claimant has alleged only conclusions of law without any supporting facts, details, or events to support such elements.

3. Claimant's claims are barred, in whole or in part, by the doctrines of estoppel, ratification, acquiescence, consent, agreement, accord and satisfaction, release, payment, and/or waiver.

4. Claimant's breach of contract claim fails because he was at all times an at-will employee of Respondents.

5. Claimant's claims are barred or limited by the occurrence or non-occurrence of conditions precedent or subsequent.

6. Claimant's claims are barred, in whole or in part, by the Statute of Frauds.

7. To the extent there was a written agreement, parole evidence is inadmissible to vary its clear and unambiguous terms.

8. Claimant's claim for breach of an implied contract fails because there was an actual contract governing the subject.

9. Claimant's breach of contract claims are barred by the doctrine of unclean hands and/or Claimant's failure to perform all required duties under the Agreement.

10. Claimant's claims are barred in whole or in part by the employment at-will doctrine.

11.      Claimant's unjust enrichment claim is barred because the parties had an express contract governing the subject matter at issue, and that express contract precludes recovery for unjust enrichment as to the same subject matter.

12.      Claimant's claim for the breach of the covenant of good faith and fair dealing fails because Respondents did not breach any specific contract provisions.

13.      Without conceding that Respondents have the burden of proof on this issue, Claimant's defamation claim is barred, in whole or in part, to the extent any alleged defamatory statements are true.

14.      Without conceding that Respondents have the burden of proof on this issue, Claimant's defamation claim is barred, in whole or in part, because the alleged defamatory statements constitute nonactionable opinion.

15.      Without conceding that Respondents have the burden of proof on this issue, Claimant's defamation claim is barred, in whole or in part, because the statements are privileged.

16.      Claimant's defamation claim is barred, in whole or in part, because he failed to plead any facts supporting a claim of defamation.

17.      Without conceding that Respondents have the burden of proof on this issue, Claimant's defamation claim is barred, in whole or in part, by the doctrine of innocent construction.

18.      Respondents acted in good faith and without malice towards Claimant.

19.      Claimant's Form U5 defamation claim fails as a matter of law because the information on the Form U5 is true and accurate.  Moreover, Respondents are under no legal obligation to withdraw, modify, or amend Claimant's Form U5.

20.     Claimant's claims and/or damages may be limited by the after-acquired evidence doctrine.

21.     Claimant does not have any contractual or other basis for recovering compensatory damages, punitive damages, attorney's fees, interest, costs, or any other relief in this matter.

22.     Claimant is precluded from recovery because he has not suffered any damages or any legally recognizable injury and/or the damages he seeks are speculative and not recoverable as a matter of law.

23.     Without conceding that Respondents have the burden of proof on this issue, Respondents based all actions with regard to Claimant on legitimate, good faith, non-discriminatory, and non-retaliatory business factors.

24.     Without conceding that Respondents have the burden of proof on this issue, and expressly denying that Claimant suffered any actionable damages, Respondents aver that, through use of diligent efforts, Claimant could have mitigated his alleged loss of earnings and other damages, if any, and, upon information and belief, failed to do so.

25.     Claimant has failed to mitigate his damages, if any, and to the extent of such failure to mitigate, any damages awarded to Claimant should be reduced accordingly.

26.     To the extent Claimant seeks punitive damages, Claimant is not entitled to such since Respondent acted at all times towards Claimant in good faith, without malice, evil intent, or reckless disregard for Claimant's rights, and made good faith efforts to comply with the law.

27.     An award of punitive damages would unconstitutionally deny Respondents' right to due process and/or equal protection under the Fifth and Fourteenth Amendments to the United States Constitution and under the constitution of the state of New York.

28.     At the time of filing this Answer, Respondents have neither commenced nor completed discovery in this cause and respectfully reserve the right to amend this Answer based on discovery of additional information or defenses at a later date, up to and including the time of hearing.

## V.     COUNTERCLAIM OF RESPONDENT ODEON CAPITAL GROUP, LLC

### A.     Background

1.     As discussed above, Claimant's Agreement with Respondent Odeon contained provisions through which he was entitled to receive RMBS bonuses based on the Firm's revenues for such transactions.  The gross RMBS bonus would be calculated as a percentage of overall revenues and, pursuant to the Agreement, would be reduced by the amount of sales commissions already paid to Claimant for such transactions.

2.     During Claimant's employment, Odeon calculated RMBS bonuses on a monthly basis but neglected to reduce those bonuses by subtracting sales commissions already paid to Claimant.

3.     As a result, Odeon paid, and Claimant accepted, RMBS bonuses significantly in excess of the amounts owed under the Agreement.  Claimant has since enjoyed the receipt of these bonuses even though they were not earned.

### COUNT I
### UNJUST ENRICHMENT

4.     Respondent Odeon incorporates paragraphs 1 through 3 of its Counterclaim as if set forth fully herein.

5.     Odeon conferred a significant benefit on Claimant by paying him RMBS bonuses without reducing those payments by the amounts of sales commissions already paid, resulting in an overpayment to Claimant in excess of $100,000.

39

6.     If Claimant is permitted to retain this benefit without repayment to Odeon, he will be unjustly enriched at the expense of Odeon.

**WHEREFORE,** Odeon respectfully requests an Award in its favor in excess of $100,000 (the amount of overpayments it made to Claimant through RMBS bonuses will be proven at the final hearing) and any additional relief the Panel deems just and appropriate.

Respectfully submitted,

Carole G. Miller
Stuart D. Roberts
*Attorneys for Respondents Odeon Capital Group, LLC, Bonwick Capital Partners, LLC, Mathew Van Alstyne, and Evan Schwartzberg*

**OF COUNSEL:**
BRESSLER, AMERY & ROSS, PC
2200 Wells Fargo Tower
420 20th Street North
Birmingham, Alabama 35203
T:  205.719.0400
F:  205.719.0500
Email:  cmiller@bressler.com
Email:  sroberts@bressler.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 23rd day of September, 2014, served a copy of the foregoing on Claimant's counsel below via email, and served the original and three copies upon FINRA below via email and Federal Express, along with an executed Submission Agreement:

Nicole Haynes, Case Assistant Manager
FINRA DISPUTE RESOLUTION
Northeast Processing Center
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006
nicole.haynes@finra.org
neprocessingcenter@finra.org

Gary Trachten, Esq.
Kudman Trachten Aloe LLP
The Empire State Building
350 Fifth Avenue
Suite 4400
New York, New York 10118
gtrachten@kudmanlaw.com

OF COUNSEL

41

**From:**                Bret Ackerman [backerman@odeoncap.com]
**Sent:**                Monday, January 13, 2014 4:35 PM
**To:**                  Mathew Van Alstyne
**Cc:**                  Katherine Abikarram
**Subject:**           Resignation to outside contactor

Mat-

As discussed I am resigning employment but will transition to being a contractor effective January 1, 2014.

Bret

Sent from my HTC

Odeon Capital Group LLC is a U.S. FINRA registered broker-dealer. This message is intended only for the personal and confidential use of the recipient(s) named above. Under no circumstances are materials or information presented herein to be reproduced or distributed, in any form, in whole or in part, without the express authorization from the Firm. Any unauthorized use, duplication or disclosure is prohibited by law and will result in prosecution. If you are not an intended recipient, you have received this message in error and any review, dissemination, distribution, copying, or printing of this message is strictly prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and permanently delete all copies of this message. Any attachments are for use by customers of the Firm only. These documents are for informational purposes only and do not constitute an offer or solicitation regarding any of the information contained herein. Only the relevant Offering Memorandum of which this document is not part should be relied upon for the purpose of investing. The securities recommended, offered, or sold by the Firm, are not insured by the Federal Deposit Insurance Corporation, are not deposits or other obligations of any insured depository institution, and are subject to risks, including the possible loss of principal amount invested. All rights reserved.

Securities offered through Odeon Capital Group LLC, a Registered Broker-Dealer and Member: FINRA, SIPC, MSRB.

**EXHIBIT A**

| | |
|---|---|
| **From:** | Bret Ackerman [backerman@odeoncap.com] |
| **Sent:** | Monday, February 17, 2014 4:22 PM |
| **To:** | Mathew Van Alstyne; Katherine Abikarram |
| **Cc:** | Bret Ackerman |
| **Subject:** | Employee Status |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Mat/Katherine-

As we discussed, please make sure that my formal designation is returned to being an employee effective immediately.

Thank you,

Bret


Bret Ackerman
Head of RMBS Trading
Odeon Capital Group
750 Lexington Avenue - 27th Floor
NY, NY 10022
(o) 212-257-6988
(c) 917-304-4392

Odeon Capital Group LLC is a U.S. FINRA registered broker-dealer. This message is intended only for the personal and confidential use of the recipient(s) named above. Under no circumstances are materials or information presented herein to be reproduced or distributed, in any form, in whole or in part, without the express authorization from the Firm. Any unauthorized use, duplication or disclosure is prohibited by law and will result in prosecution. If you are not an intended recipient, you have received this message in error and any review, dissemination, distribution, copying, or printing of this message is strictly prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and permanently delete all copies of this message. Any attachments are for use by customers of the Firm only. These documents are for informational purposes only and do not constitute an offer or solicitation regarding any of the information contained herein. Only the relevant Offering Memorandum of which this document is not part should be relied upon for the purpose of investing. The securities recommended, offered, or sold by the Firm, are not insured by the Federal Deposit Insurance Corporation, are not deposits or other obligations of any insured depository institution, and are subject to risks, including the possible loss of principal amount invested. All rights reserved.

Securities offered through Odeon Capital Group LLC, a Registered Broker-Dealer and Member: FINRA, SIPC, MSRB.

| From: | Bret Ackerman [backerman@odeoncap.com] |
|---|---|
| Sent: | Monday, February 17, 2014 8:42 PM |
| To: | Evan Schwartzberg |
| Cc: | Mathew Van Alstyne |
| Subject: | Unresolved Monetary Disputes |

| Follow Up Flag: | Follow up |
|---|---|
| Flag Status: | Flagged |

Evan-

We have had an outstanding dispute relating to a trade from April 2013, essentially since I got back from medical leave.  The commission on that trade was paid out in August (while I was in treatment) in a manner inconsistent with both my contract and my established agreement with Mike.  This trade occurred months before I took medical leave, and was during the period in which the deal to split both of our commissions was still in effect with Mike, and thus I am due the proper share of the profit from this trade.  I was to be paid ~50,000usd for my role as trader, and mike ~150,000usd as his role as salesman.   The agreement to split all commissions with Mike started January 1, 2013 and ended when I left for treatment, and thus mike was to receive ~100,000 and I was to receive ~100,000.  As I was away in treatment for my disability, mike paid himself ~150,000 and paid me 0.  It appears to me that if I had not taken leave for my disability, I would have been paid my proper share of this disputed trade. I should not be punished for addressing my illness.  You do not have the right to withhold my compensation.  I have returned a better employee and am more focused and productive that before I began addressing my disability, yet feel I am being more harassed than before I left (or more so than any other member of our team).  I wish I didn't have this illness, but I cannot change the hand that was dealt to me and have been and continue to be a productive employee - Can we please figure out a way to put this issue to rest as it weighs on me daily and has been outstanding for almost six months now.

Exacerbating this issue is my view that my compensation was miscalculated by ~47,000 dollars this month, I have been told by Mat that we are using a website to calculate commissions since Jan 1, and while a couple thousand off last month wasn't a big deal, ~47,000 this month puts constraint on my life and ability to function.  I will try to go over the figures with Mat and figure out what is missing here, but I also have attached a spreadsheet to this email showing my commissions for the month.  Is there anything here that seems out of place? ~940k profit for the desk = ~35,500 in trader commissions, and then the back and forth trade between CS and BofA netted Odeon ~77,500, and the two portfolio trades netted ~66,100 and ~22,000 respectively.  I bot and and/or sold 93.7% of the first portfolio, and 71.4% of the second portfolio, which would be an attribution of ~61,900 and ~15,775.  Other trades add up to ~67,250, for a total of 222,400usd, 40-45% of which (my agreed upon commission scale) is 95,108.  Please see attached spreadsheet for detail.  I do not want to fight over this but I cannot put this on the back burner any longer - I feel like I am just being pushed aside and being taken advantage of because of my being away while treating my disability.  If I am not to go by the website (which says 130k also) than how can I verify my trades are being paid out accordingly?

Can we please focus on remedying these two items this week as holding back my pay is not right, and is beginning to have significant consequences on my daily life, my personal well-being and my feeling that you are welcoming me back to my old position without change.  I really do appreciate your attention to these matters.

All the best,

**EXHIBIT B**

Bret

Bret Ackerman
Head of RMBS Trading
Odeon Capital Group
750 Lexington Avenue - 27th Floor
NY, NY 10022
(o) 212-257-6988
(c) 917-304-4392

Odeon Capital Group LLC is a U.S. FINRA registered broker-dealer. This message is intended only for the personal and confidential use of the recipient(s) named above. Under no circumstances are materials or information presented herein to be reproduced or distributed, in any form, in whole or in part, without the express authorization from the Firm. Any unauthorized use, duplication or disclosure is prohibited by law and will result in prosecution. If you are not an intended recipient, you have received this message in error and any review, dissemination, distribution, copying, or printing of this message is strictly prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and permanently delete all copies of this message. Any attachments are for use by customers of the Firm only. These documents are for informational purposes only and do not constitute an offer or solicitation regarding any of the information contained herein. Only the relevant Offering Memorandum of which this document is not part should be relied upon for the purpose of investing. The securities recommended, offered, or sold by the Firm, are not insured by the Federal Deposit Insurance Corporation, are not deposits or other obligations of any insured depository institution, and are subject to risks, including the possible loss of principal amount invested. All rights reserved.

Securities offered through Odeon Capital Group LLC, a Registered Broker-Dealer and Member: FINRA, SIPC, MSRB.

# COMPLIANCE AND SUPERVISORY PROCEDURES MANUAL

# ODEON CAPITAL GROUP LLC
*Member FINRA/SIPC/MSRB*
*October 2012*

COMPLIANCE AND SUPERVISORY PROCEDURES
MANUAL
*(INTERNAL USE ONLY)*

EXHIBIT C

| COMPLIANCE MANUAL AND WRITTEN SUPERVISORY PROCEDURES | INSIDER TRADING POLICY AND PROCEDURES |
|---|---|

## I.   OVERVIEW

Section 15(f) of the 1934 Act requires that a broker-dealer establish, maintain, and enforce written policies and procedures reasonably designed to prevent the misuse of material, non-public information by the broker-dealer and its employees. In addition, employees of Odeon have ethical and legal responsibilities to maintain the confidences of Odeon and its customers, and to protect as valuable assets confidential and proprietary information developed by or entrusted to Odeon. Furthermore, violations of the laws against insider trading by Odeon employees can expose Odeon and such employees to severe civil and criminal liability.

Any trading and investment activities undertaken by employees, either for Odeon or for their own personal accounts, must remain in full compliance with the law and highest ethical standards and must avoid even the appearance of impropriety. Accordingly, employees must exercise good judgment when engaging in securities transactions. Supervisors when reviewing trading activity should be mindful of such issues.

Odeon has adopted the following policies and procedures to (i) ensure the propriety of employee trading activity; (ii) protect and segment the flow of material, non-public and other confidential information; (iii) avoid possible conflict situations; and (iv) identify trades that may violate the prohibitions regarding insider trading and tipping and other manipulative and deceptive devices contained in the federal and state securities laws and the rules thereunder. Each Registered Person must sign the acknowledgement attached as **Exhibit A** certifying that he or she has read the Insider Trading Policies and Procedures contained in this Manual and will comply with the policies and procedures set forth herein and all applicable laws, rules and regulations.

The terms "insider trading" and "inside information" are not precisely defined in the federal securities laws. Rather than a static definition, the rules and regulations concerning insider trading are dynamic and flexible, allowing regulators to encompass the full range of activities that currently do, and in the future may, fall within the generally regarded scope of the rules. Generally, the term "insider trading" is used to refer to the use of material non-public information to trade in securities (whether or not one is an "insider") or to communications of material non-public information to others who will act upon such information (known as "tipping").

## II.   DEFINITIONS

A.   Who is an Insider?

The concept of "insider" is broad. It includes officers, directors and 10% (or more) shareholders of a company. In addition, a person can be a "temporary

| COMPLIANCE MANUAL AND WRITTEN SUPERVISORY PROCEDURES | EMPLOYEE ACTIVITIES |
|---|---|

unless Odeon approves the transaction, in which case the transaction shall be recorded on Odeon's books and records and Odeon shall supervise the person's participation. If no selling compensation will be received, Odeon, in its sole discretion, may approve the participation and may impose conditions to be complied with by the Associated Person. Associated Persons are not permitted to purchase securities for their own personal accounts from Firm customers or to sell any Firm customers securities from their personal investment portfolio.

Information regarding private securities transactions must be provided whenever an Associated Person joins Odeon. This information must be updated at least annually and before an Associated Person engages in a private securities transaction not previously reported to Odeon.

Associated Persons are prohibited from purchasing any new equity issues (*i.e.*, initial public offerings) for an Associated Person-Related Account. Questions about participation in any public offering should be directed to the Chief Compliance Officer.

Associated Persons should note that there is no current requirement for pre-approval, by either a Principal or the Chief Compliance Officer, of Associated Person-Related trading. However, Odeon retains the right to require an Associated Person to rescind or reverse any transaction which is considered to have been improper, or which appears improper in light of subsequent developments, even though proper when made. Also, while Odeon encourages its Associated Persons to develop investment programs, Odeon strongly discourages speculative trading and short-term trading profits.

## III.   OUTSIDE BUSINESS ACTIVITIES

FINRA Rule 3270. The Rule remains essentially unchanged with the addition of disclosure of compensation and the following:

1. Does the OBA interfere with or otherwise compromise the registered person's responsibilities to the firm or the firm's customers?

2. Will the OBA be viewed by customers or the public as part of the member's business based upon, among other factors, the nature of the proposed activity and the manner in which it will be offered?

3. Is the proposed OBA in fact a "private securities transaction", bringing it under the regulatory scope of NASD Rule 3040?

Registered Representatives must obtain prior written approval from the Chief Compliance Officer before engaging in any of the following outside activities:

   1.   Serving as a director or officer in any corporation.

| COMPLIANCE MANUAL AND WRITTEN SUPERVISORY PROCEDURES | EMPLOYEE ACTIVITIES |
|---|---|

unless Odeon approves the transaction, in which case the transaction shall be recorded on Odeon's books and records and Odeon shall supervise the person's participation. If no selling compensation will be received, Odeon, in its sole discretion, may approve the participation and may impose conditions to be complied with by the Associated Person. Associated Persons are not permitted to purchase securities for their own personal accounts from Firm customers or to sell any Firm customers securities from their personal investment portfolio.

Information regarding private securities transactions must be provided whenever an Associated Person joins Odeon. This information must be updated at least annually and before an Associated Person engages in a private securities transaction not previously reported to Odeon.

Associated Persons are prohibited from purchasing any new equity issues (*i.e.*, initial public offerings) for an Associated Person-Related Account. Questions about participation in any public offering should be directed to the Chief Compliance Officer.

Associated Persons should note that there is no current requirement for pre-approval, by either a Principal or the Chief Compliance Officer, of Associated Person-Related trading. However, Odeon retains the right to require an Associated Person to rescind or reverse any transaction which is considered to have been improper, or which appears improper in light of subsequent developments, even though proper when made. Also, while Odeon encourages its Associated Persons to develop investment programs, Odeon strongly discourages speculative trading and short-term trading profits.

## III.  OUTSIDE BUSINESS ACTIVITIES

FINRA Rule 3270. The Rule remains essentially unchanged with the addition of disclosure of compensation and the following:

1. Does the OBA interfere with or otherwise compromise the registered person's responsibilities to the firm or the firm's customers?

2. Will the OBA be viewed by customers or the public as part of the member's business based upon, among other factors, the nature of the proposed activity and the manner in which it will be offered?

3. Is the proposed OBA in fact a "private securities transaction", bringing it under the regulatory scope of NASD Rule 3040?

Registered Representatives must obtain prior written approval from the Chief Compliance Officer before engaging in any of the following outside activities:

  1.  Serving as a director or officer in any corporation.

**From:** Bret Ackerman [backerman@odeoncap.com]
**Sent:** Thursday, March 06, 2014 5:11 PM
**To:** Mathew Van Alstyne
**Subject:** Re: Hey

Lets discuss after the investigation by your lawyer is complete.

Sent from my HTC

----- Reply message -----
From: "Mathew Van Alstyne" <MVanAlstyne@OdeonCap.com>
To: "Bret Ackerman" <backerman@odeoncap.com>
Subject: Hey
Date: Thu, Mar 6, 2014 5:05 PM

So have you been able to speak to Lindsay? Been a week since me made our proposal.

Mat


Mathew Van Alstyne
212-257-6975
646-262-1352

Odeon Capital Group LLC is a U.S. FINRA registered broker-dealer. This message is intended
only for the personal and confidential use of the recipient(s) named above. Under no
circumstances are materials or information presented herein to be reproduced or distributed,
in any form, in whole or in part, without the express authorization from the Firm. Any
unauthorized use, duplication or disclosure is prohibited by law and will result in
prosecution. If you are not an intended recipient, you have received this message in error
and any review, dissemination, distribution, copying, or printing of this message is strictly
prohibited. If you have received this message in error, please notify the sender immediately
by return e-mail and permanently delete all copies of this message. Any attachments are for
use by customers of the Firm only. These documents are for informational purposes only and do
not constitute an offer or solicitation regarding any of the information contained herein.
Only the relevant Offering Memorandum of which this document is not part should be relied
upon for the purpose of investing. The securities recommended, offered, or sold by the Firm,
are not insured by the Federal Deposit Insurance Corporation, are not deposits or other
obligations of any insured depository institution, and are subject to risks, including the
possible loss of principal amount invested. All rights reserved.

Securities offered through Odeon Capital Group LLC, a Registered Broker-Dealer and Member:
FINRA, SIPC, MSRB.

Odeon Capital Group LLC is a U.S. FINRA registered broker-dealer. This message is intended
only for the personal and confidential use of the recipient(s) named above. Under no
circumstances are materials or information presented herein to be reproduced or distributed,
in any form, in whole or in part, without the express authorization from the Firm. Any
unauthorized use, duplication or disclosure is prohibited by law and will result in
prosecution. If you are not an intended recipient, you have received this message in error
and any review, dissemination, distribution, copying, or printing of this message is strictly
prohibited. If you have received this message in error, please notify the sender immediately
by return e-mail and permanently delete all copies of this message. Any attachments are for

1

**EXHIBIT D**

use by customers of the Firm only. These documents are for informational purposes only and do not constitute an offer or solicitation regarding any of the information contained herein. Only the relevant Offering Memorandum of which this document is not part should be relied upon for the purpose of investing. The securities recommended, offered, or sold by the Firm, are not insured by the Federal Deposit Insurance Corporation, are not deposits or other obligations of any insured depository institution, and are subject to risks, including the possible loss of principal amount invested. All rights reserved.

Securities offered through Odeon Capital Group LLC, a Registered Broker-Dealer and Member: FINRA, SIPC, MSRB.