G44eodec

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ODEON CAPITAL GROUP, et al.,

               Petitioners,

         v.                          16 CV 274(JSR)

BRET ACKERMAN,

              Respondent.

------------------------------x

                             April 4, 2016

                             2:22 p.m.


Before:

                   HON. JED S. RAKOFF,

                            District Judge

                    APPEARANCES

BRESSLER AMERY & ROSS
     Attorneys for Petitioners
BY:  MARK D. KNOLL

KUDMAN TRACHTEN  ALOE, LLP
     Attorneys for Respondent
BY:  PAUL H. ALOE
     DAVID SAPONARA

2

G44eodec

| | |
|---|---|
| 1 | (In open court) |
| 2 | THE DEPUTY CLERK:  Will the parties please identify |
| 3 | themselves for the record. |
| 4 | MR. KNOLL:  Good afternoon, your Honor.  Mark Knoll |
| 5 | from Bressler, Amery & Ross on behalf of the petitioners, Odeon |
| 6 | Capital Group, Matthew Van Alstyne and Evan Schwartzberg. |
| 7 | THE COURT:  Good afternoon. |
| 8 | MR. ALOE:  Paul Aloe of Kudman Trachten Aloe on behalf |
| 9 | of the respondent, Bret Ackerman. |
| 10 | THE COURT:  Good afternoon. |
| 11 | All right.  To deal with a preliminary matter, the |
| 12 | declaration of Mr. Aloe is stricken, except to the extent that |
| 13 | it attaches the transcript of the arbitration hearing and any |
| 14 | exhibits that were actually introduced or sought to be |
| 15 | introduced at the arbitration hearing. |
| 16 | So I'll hear on -- these are cross motions, but we'll |
| 17 | hear first from petitioner. |
| 18 | MR. KNOLL:  Thank you very much, your Honor.  Again, |
| 19 | it's Mark Knoll from Bressler, Amery & Ross on behalf of |
| 20 | petitioners. |
| 21 | Would your Honor prefer I address the Court from the |
| 22 | table or from the podium? |
| 23 | THE COURT:  Whichever is easier for you. |
| 24 | MR. KNOLL:  I'll address the Court from here. |
| 25 | Thank you very much again for your time and attention |

G44eodec

1    to this matter.

2            Your Honor has in this petition to vacate the

3    arbitration award five issues before the Court to address.  Two

4    of those issues we believe warrant that the award be vacated in

5    its entirety, and three of those issues warrant what we believe

6    should be a modification of the award.

7            For the two issues that warrant that the award be

8    vacated in its entirety, we have presented to the court already

9    in our initial petition that the arbitrators engaged in what

10   the FAA, or the Federal Arbitration Act, would construe as

11   misconduct for their failure to allow a full opportunity and a

12   fair opportunity to review and respond to expert damages

13   analyses presented not only immediately preceding the hearing,

14   but at the very beginning of the hearing, and then, most

15   critically to this petition, at the very end of the hearing; in

16   fact, in the last several hours of the hearing.

17           Second, and the ground that we have asked the Court --

18   we've been permitted to brief this in letter briefs that were

19   provided to the Court a couple weeks ago, not known to Odeon

20   until about four weeks ago.  We believe that we now have proof

21   that Mr. Ackerman presented knowingly false testimony on a key

22   issue to the case.  We believe that this false testimony

23   affected the entire proceeding and amounts to the procurement

24   of the award by fraud in violation of Section 10(a)(1) of FAA.

25           THE COURT:  I think, since I have other matters this

G44eodec

1    afternoon, you should confine yourself to those two global

2    issues and not devote any part of your oral argument to the

3    subordinate issues, partial issues.

4             MR. KNOLL:  Certainly.  Then just for the record,

5    then, can I just identify those for the record.

6             THE COURT:  Sure, of course.

7             MR. KNOLL:  Those issues are, first, that we believe

8    the award, to the extent that it is confirmed in any way, the

9    component of that award that goes to the award of attorneys

10   fees we believe is a misapplication of the law and should be

11   modified, because it does not -- the award essentially provided

12   for $247,000 worth of attorneys fees when there was only an

13   award granted on two out of the 13.

14            The second issue related to the interest component of

15   the award, which we believe has no basis in the record, as far

16   as the date from which the interest begins to accrue.

17            The third issue relates to the imposition of joint and

18   several liability, which we are not necessarily contesting, but

19   we believe the award should be modified to reflect New York law

20   such that there should be no enforcement of the award against

21   the individual members of the LLC unless and until the LLC

22   fails to satisfy the award.  And we laid that out in the

23   papers.

24            THE COURT:  And I'm not suggesting that I have a view

25   one way or the other as to any of those points, but I have

G44eodec

1    limited time.

2                    MR. KNOLL:  Understood.

3                    THE COURT:  So we'll confine the oral argument to the

4    two global issues.

5                    MR. KNOLL:  Understood.

6                    Speaking of the global issues then, your Honor, it's

7    first important for us just to go ahead and set the stage for

8    the legal standard.  And we certainly understand that

9    arbitration awards are accorded a certain degree of deference.

10   We understand and we accept that.  We understand that

11   arbitration can be an efficient means of resolving disputes.

12                   We also recognize the long-recognized benefit to the

13   judicial system and its limited resources that flows from an

14   effective arbitration process.  And understand, we are not

15   asking the Court to substitute its factual determinations for

16   the panel's.  To the extent that that's what the respondent is

17   arguing in this case, it's a strawman.  We are simply asking

18   the Court to evaluate the process by which this award was

19   arrived at.

20                   Because, in fact, no matter how the standard is

21   interpreted with respect to the deference that an arbitration

22   award is supposed to be due, the fact remains that under the

23   FAA, judicial tolerance and deference to an arbitration award

24   absolutely has its limits.

25                   THE COURT:  Counsel, again, I'm not in disagreement

6

G44eodec

1    with anything you say, but it is boilerplate.

2              MR. KNOLL:  Boilerplate.  I'm sorry.

3              THE COURT:  So let's get to the real issues.

4              MR. KNOLL:  So on the two issues that are in principal

5    contest here, the first is that during the arbitration hearing,

6    and most especially on the final day of the hearing, the panel

7    permitted the introduction of damages analyses without giving

8    the petitioner at the arbitration or the petitioner here an

9    opportunity, a full and fair opportunity, to evaluate that

10   evidence and respond to it.

11             But I'll address that second.  What I'd like to do is

12   actually address the issue of what we believe are the knowing

13   misrepresentations made at the arbitration first.  Because as

14   we understand, there's absolutely an obligation on the part of

15   the parties to an arbitration to tell the truth.

16             Now, let's put the statements that we have identified

17   in our letter brief to the Court in a little bit of context.

18   One of the key issues in this case involved Mr. Ackerman's

19   claim that an internal investigation by Odeon into a trade that

20   he made in February 2014 was actually retaliatory.  The

21   allegation was that this investigation, this internal

22   investigation into a trade that he made, was trumped up; that

23   it essentially was a false investigation.  The trade itself

24   involved a transaction by Mr. Ackerman purchasing a bond in his

25   personal account from an institutional client, and then less

G44eodec

1    than a day later selling that bond on to a retail client at a

2    significant markup.

3            The firm investigated this activity.  My firm was

4    asked to investigate the activity.  And, in fact, I did

5    interview Mr. Ackerman in connection with that and conducted an

6    internal review.  Following that internal review, or at least

7    at the initial stages of that internal review, the firm

8    determined to reverse the trade to the customer -- I'm sorry,

9    to reverse the trade and to give the bond to the customer at no

10   markup.  Essentially they found that the trade should not have

11   gone through the way it went through.

12           The concern was that the trade could have been viewed

13   by FINRA, or could be viewed to have violated FINRA's what are

14   called the markup rules.  That would be FINRA Rule 2121 and its

15   related interpretative material, and that the trade was made

16   without disclosure to the retail client; that the trade was

17   from or that the bond came from Mr. Ackerman's personal

18   account.

19           Now, Mr. Ackerman during the arbitration hearing

20   testified about this internal investigation at length.  He said

21   he believed the internal investigation was trumped up.  He said

22   he believed it was retaliatory and baseless.  And we find

23   numerous references to this certainly at the transcript

24   beginning at page 100 through 107.

25           There was extensive discussion about this trade during

G44eodec

1    Mr. Ackerman's cross-examination as well.  And that begins, for

2    the Court's reference, around page 372 of the transcript.  In

3    fact, while he's being questioned about this transaction,

4    Mr. Ackerman says to counsel for petitioners during the cross,

5    quote, there was nothing wrong with what I did.

6         At that point Mr. Ackerman is presented with a copy of

7    what's called an OTR request.  In FINRA parlance, an OTR is an

8    on-the-record interview.  And FINRA issues requests for

9    on-the-record interviews pursuant to Rule 8210.  Mr. Ackerman,

10   as an associated person of a member firm, was subject to FINRA

11   rules, including FINRA Rule 8210.  That request was issued in

12   matter number -- the FINRA matter number is 20120328283.  And

13   just for the Court's information, broker-dealers are routinely

14   provided or sent information requests, examination requests,

15   follow-up inquiries related to their trading sales practice

16   activities and the like.

17        This particular matter number, 20120328283, was a

18   routine request from FINRA to Odeon that inquired about 30-odd

19   or 39 potential trades, or 39 trades of which Mr. Ackerman was

20   the salesperson on 13.  Mr. Ackerman was asked to come and

21   provide an OTR after he had been terminated by the firm.  So in

22   other words, FINRA not only sent a copy of the OTR request to

23   the firm, but a copy was also sent to Mr. Ackerman at his home.

24        Mr. Ackerman conceded that this April 2, 2014, OTR

25   request involved more than just the single personal account

G44eodec

1    trade at issue.  Instead, he admitted it involved other trades,

2    not necessarily specifically the personal account trade.

3         Now, the cross-examination at that point then returns

4    to the personal account trading.  And I apologize for this

5    being a little bit disjointed, but the way the

6    cross-examination flowed was -- again, Mr. Ackerman was asked

7    about the personal account trading.  He said that this was of

8    no moment.  He said that whatever he did was correct.  He also

9    said that he did nothing wrong.

10        Then counsel for petitioner -- and this is at page 383

11   of the transcript.  This is where, during this back and forth,

12   Arbitrator Lutati, one of the members of the panel, Cara Lutati

13   specifically asked Mr. Ackerman, what was the outcome of the

14   FINRA investigation?  At that point my partner who was trying

15   the case for us, Carol Miller, she responded.  She said, quote,

16   he said I asked him about it on the -- about the on-the-record

17   interview.  I didn't know if it was related to that trade or

18   others because it was after he left.  I don't know the outcome.

19   He would know the outcome.  But it was related to other trades.

20   Quote, it wasn't related to these, is what he said.

21        Ms. Lutati responds, okay.

22        Mr. Ackerman then invites a question.  He says, if you

23   are ready to ask me a question, I could tell you.

24        Ms. Miller then says, is that -- meaning the FINRA

25   investigation -- still pending?

G44eodec

1          Mr. Ackerman responds, no.

2          There's no qualification.  There's no suggestion, as

3     Mr. Aloe indicates in his brief, that this was based on his

4     belief at the time.

5          THE COURT:  So let's assume that was -- it clearly was

6     inaccurate.  And let's assume it was even knowingly inaccurate.

7     So what what's the materiality?

8          MR. KNOLL:  The materiality is actually very clear.

9     The way that this claim ended up being litigated throughout the

10    arbitration essentially was Mr. Ackerman paid what he was

11    supposed to be paid on trades while he was either at the desk

12    or the salesperson or the trader involved in particular trades.

13    Mr. Ackerman testified repeatedly that the damages analysis --

14    in other words, the review of all the trades, the review of all

15    the transactions and his independent subjective determinations

16    about what he should be paid, which relationships were his,

17    which transactions were all done by Mr. Ackerman.  He simply

18    handed these assumptions and created the spreadsheets

19    themselves.  And all his expert did at the end of the testimony

20    or at the end of the hearing was just verified the math.

21          Now, that means that Mr. Ackerman directly and without

22    any hesitation whatsoever placed his credibility absolutely at

23    issue in the arbitration.  In other words, it was his word, his

24    understanding --

25          THE COURT:  Does that mean that any inaccuracy, no

G44eodec

1    matter how otherwise unrelated to the subject matter, is a

2    ground for vacating an arbitration award?

3              MR. KNOLL:  If it is knowing, and if it is designed to

4    bolster his credibility, I would say the answer is yes.

5              THE COURT:  Then I think there's going to be very few

6    arbitrations that will survive, since in common experience it

7    is human nature, I'm afraid, to not always tell the truth.

8              MR. KNOLL:  I absolutely understand, your Honor.

9              But here, this is not a situation where you have two

10   witnesses with different recollections of events who are saying

11   things where one can't possibly be true while the other is

12   true.  That's not the situation that we're talking about here.

13   We're talking about a statement, and --

14             THE COURT:  Supposing he had said, I don't know the

15   answer.

16             MR. KNOLL:  Then this would not be anywhere near as

17   much of an issue.

18             THE COURT:  So if the accurate answer had been given,

19   nothing would have followed from that, right?

20             MR. KNOLL:  Not necessarily.  I mean, again, there are

21   two parts to the misstatement that he makes.  The first part of

22   the misstatement is, this action, this investigation, is no

23   longer pending.  He says no.

24             The second part of the misstatement --

25             THE COURT:  And, well, let's take each part at a time.

G44eodec

```
 1    So if the answer -- the correct answer is either I don't know

 2    or I think it may still be pending, right?

 3              MR. KNOLL:  Yes.

 4              THE COURT:  Now, given that answer, what, if anything,

 5    would follow from that?

 6              MR. KNOLL:  I don't know the answer to that.

 7              THE COURT:  I don't think anything likely would have

 8    followed that has any bearing on this case.

 9              MR. KNOLL:  We don't know the answer to that.  What we

10    do know --

11              THE COURT:  I think the Court has to, in assessing

12    materiality, look to what the likely and probable results would

13    have been.

14              What was the second part?

15              MR. KNOLL:  Let's actually parse that just a moment,

16    your Honor.  I understand that if he says, I don't know what

17    the status of the matter is, that would be one statement.  But

18    here's what Mr. Ackerman does next.  He goes on to say that in

19    the course of this OTR, when he's actually called in for

20    testimony with FINRA -- and remember, there is no way for Odeon

21    to verify this next set of statements that's going to come out

22    of his mouth.  He says that he specifically told FINRA about

23    the personal account trade, the one that was the subject of all

24    of this testimony, the one that he said was contrived, that he

25    said was a made-up investigation; he said that he specifically
```

G44eodec

```
 1    told FINRA about that trade, and that FINRA said, we have no

 2    problem with this trade.

 3              Now, I'm asking the Court, one, we are asking for

 4    permission to amend our petition to include --

 5              THE COURT:  Excuse me.  So what do you think was the

 6    correct -- what he should have said there?  Are you contending

 7    he didn't tell them or --

 8              MR. KNOLL:  I am -- yes.

 9              THE COURT:  So it's not only that they said okay; it's

10    that when they -- according to your view, but he didn't tell

11    him about it at all?

12              MR. KNOLL:  I don't know the answer to that.  There's

13    no way for me to test whether he actually told FINRA about that

14    trade.

15              THE COURT:  So that may well be true, for all you

16    know.

17              MR. KNOLL:  That may very well be true.

18              THE COURT:  With respect to the second part, that they

19    told him it was okay, was there any follow-up questions by

20    you --

21              MR. KNOLL:  I didn't try the case.

22              THE COURT:  By your side as to, well, who told you

23    that, or what context did they tell you that, or anything else

24    about it?

25              MR. KNOLL:  No.  The testimony by that point is clear.
```

G44eodec

1    He says, right, I had brought it up with their investigators

2    asking them about it.

3              So in other words, now this is Mr. Ackerman placing

4    this trade and FINRA's review of it at issue.  As they were

5    asking me about other trades from late 2011, 2012, and they

6    told me -- I asked them, is there anything improper with this?

7    And they said, quote, there is nothing improper with it.

8              THE COURT:  So you don't know whether that's true or

9    false?

10             MR. KNOLL:  I will submit to the Court that, based

11   upon my understanding, right, of FINRA rules and practices --

12   I've been conducting enforcement --

13             THE COURT:  Extremely unlikely they would do it.

14             MR. KNOLL:  It's incredibly unlikely they would do it.

15             THE COURT:  And anyone who has any familiarity with

16   FINRA, or indeed, any investigatory situation involving a

17   government or quasi-government agency knows that.

18             So why wasn't there follow-up questions?

19             MR. KNOLL:  Well, the follow-up question was from the

20   arbitrator:  And to be clear, FINRA took no action?

21             To which Mr. Ackerman responds, correct.

22             THE COURT:  So --

23             MR. KNOLL:  The arbitrator stepped in at this point

24   and asked that question.  So did FINRA take any action against

25   you?

G44eodec

1          THE COURT:  What I don't understand is -- I think it

2     is, if I understand the situation correct, that at that point

3     in time FINRA had not taken any action; true?

4          MR. KNOLL:  That's correct.

5          THE COURT:  So that answer was true, as far as it

6     went, that last answer.

7          MR. KNOLL:  That answer was -- a true answer would

8     have been, we don't know the answer to what FINRA is doing.

9          THE COURT:  No, that's a different question.

10          MR. KNOLL:  FINRA has not taken any action thus far.

11          THE COURT:  If there is a misstatement here that is at

12     all -- I'm still having very grave doubts about materiality.

13     But if there's a misstatement here that casts serious doubts on

14     his credibility, it is the statement, I was told by the

15     investigators that it was okay, or whatever those words were,

16     assuming arguendo that it seems likely that they did not say

17     that.

18          So I don't see why, since that seems so obvious, why

19     someone in the position of your counsel at the time didn't

20     follow up with questions along, who told you that?  What did

21     you tell them?  And so forth.

22          MR. KNOLL:  Well, there's two points to be made there.

23     First, the statement stands on its own.  It's either truthful

24     or it's not.  And Mr. Ackerman invited this particular

25     discussion.  He invited the discussion about whether he told

G44eodec

1    FINRA about these personal account trades, and then whether

2    FINRA told him that those trades were okay.

3             THE COURT:  Which suggests, though it's highly

4    dispositive, which suggests that he may well have not answered

5    untruthfully.  He may well have been under the misimpression

6    that they had said okay, or something like that.

7             MR. KNOLL:  But two points to this.

8             THE COURT:  Which happens all the time.

9             MR. KNOLL:  Well, first, that's not what he said.

10            And the second point is one of the things we mentioned

11   in our letter brief is that to the extent this Court has any

12   doubts about this, there can be an evidentiary hearing on this

13   point.

14            Now, Mr. Ackerman during his FINRA testimony was

15   represented by very able regulatory counsel, a man named Adam

16   Kauff.  Mr. Kauff has been doing this for a long time.

17            THE COURT:  Who represented your side?

18            MR. KNOLL:  We don't go to the FINRA OTR.

19            THE COURT:  I'm sorry?

20            MR. KNOLL:  This is during the FINRA testimony.

21            THE COURT:  I'm sorry.  I misunderstood.

22            MR. KNOLL:  Mr. Aloe's firm didn't represent him in

23   connection with the FINRA examination or FINRA testimony.

24            THE COURT:  No, I know that.  Okay.

25            MR. KNOLL:  So as your Honor is well aware, FINRA does

G44eodec

1   not communicate directly with -- once a person is represented,

2   he won't communicate directly with -- FINRA won't communicate

3   directly with the registered representative.  They will go

4   through counsel.

5          Now, if Mr. Ackerman's statements are true, then,

6   fine, let's have that test.  Now, Mr. Ackerman has placed this

7   at issue by saying that FINRA has told him that everything was

8   okay.  Now, if that means that --

9          THE COURT:  No.  There are three possibilities, as

10  near as I can tell:  Either what he said was accurate or

11  inaccurate; or it was partially accurate and partially

12  inaccurate; and in either event, if it was inaccurate in all

13  respects or in any respect, then the question is, was it

14  intentionally inaccurate as opposed to just a mistake?

15         You have to satisfy me to warrant amending your

16  petition and holding an evidentiary hearing, if necessary, that

17  it was at least in some material respect inaccurate; that there

18  is every reason to believe it was intentionally inaccurate; and

19  that it would have materially changed the evaluations made by

20  the arbitration panel of his credibility, to the extent that it

21  bore on the issues in the arbitration.  Yes?

22         MR. KNOLL:  Absolutely.

23         THE COURT:  Okay.  So I'm still having lots of

24  problems with the third of those.  Assuming for the sake of

25  argument that he gratuitously -- because you say he invites

G44eodec

1    this, which is not what usually people do if they're about to

2    tell, on your version, a whopping lie.

3          But anyway, assuming he invites this, not because he

4    thought it would help him, because he believed he had been

5    exonerated by FINRA, but, rather, because he wanted to fool the

6    arbitration panel and make them believe that he had been

7    exonerated, it's still so peripheral to the issues that were

8    before the arbitration panel that it's hard for me to see that

9    it would be probable that it would affect their evaluation.

10         But, you know, other than your arguing maybe for --

11   which I take cognizance of, and I'm not making any

12   determinations right now that any big, whopping lie is the end

13   of the subject -- if I don't accept that, it's hard for me to

14   see how it would be material.

15         MR. KNOLL:  A couple of points on that.  The first is

16   I do believe we can satisfy the first two elements.

17         But let's deal with the third, whether it's material

18   or not.  At the end of the day in this arbitration, the

19   question about whether or not Mr. Ackerman was appropriately

20   paid what he believes he was paid was a contest not between

21   some objective expert who took the firm's books and records and

22   who evaluated what he thought should be paid, right, on the one

23   hand versus the firm's evaluation of what Mr. Ackerman should

24   or should not have been paid on the other, but, instead, as the

25   transcripts make clear and as the briefs make clear,

G44eodec

Mr. Ackerman himself was the primary architect of every

determination that went to his base assumptions about what it

was he was going to get paid.

His expert says, I just ran numbers.  Mr. Ackerman

provided me with all of the assumptions.  Mr. Ackerman told me

which relationships I should be counting and which ones I

shouldn't.

So the heart of this case, whether Mr. Ackerman was

entitled to or not entitled to compensation as he requested,

was based solely on Mr. Ackerman's subjective understandings of

what it was he should be paid.  His subjective or even --

granted, Mr. Aloe will say he's looking at records, he believes

he should be entitled to those.  But it's based purely on what

Mr. Ackerman says was owed to him.

Now, that makes this at its heart a credibility

assessment.  Now, Mr. Aloe in his closing statement to the

arbitration panel vouches for Mr. Ackerman's honesty three

times.  He says, Ackerman's honest because he's honest about

his addiction problems.  Okay, fine.  But he vouches for his

honesty three times.  And then he tells the panel in the third

time that he vouches for his honesty, he says, there are no

small lies.  Because he's, again, accusing Odeon of lying.  But

Mr. Aloe himself says, there are no small lies.  We can

actually go right to the transcript where that's cited.

THE COURT:  I'm going to assume he said that --

G44eodec

1          MR. KNOLL:  That's part of --

2          THE COURT:  -- and that it's an interesting argument

3     and shows some -- Mr. Aloe must not have children.

4          But go ahead.

5          MR. KNOLL:  Here's the second leg to that argument.

6     We didn't invite Mr. Ackerman to say that FINRA told him

7     everything was okay with that trade.  He's gilding the lily.

8     And why is he gilding the lily?  Because, clearly, whether or

9     not the investigation into his personal account trade was

10    legitimate or not was a fundamental part of his case.

11    Mr. Ackerman said, everything I did with that personal account

12    trade was absolutely fine.

13         THE COURT:  All right.  I -- no, no, no.  I know you

14    want to tell me more, but I get your point.

15         MR. KNOLL:  There's only one third point.  And the

16    only point I'll make here is that in response to, for example,

17    our questions about the attorneys fees and whether they should

18    be paid or not, Mr. Aloe in his brief says all of these

19    issues -- and you can go read his brief on this on page 22 or

20    23.  He says, all of these issues are inextricably intertwined.

21    So when it comes to these, you don't have to make a big

22    whopping lie about the major thing.  That's a matter for proof.

23    That's a matter of contest between two parties to a litigation.

24    I get that.

25         But I get that if you're going to have different

G44eodec

```
 1    views --
 2               THE COURT:  Counsel, I get your point.
 3               Why don't we move to the -- you wanted to tell me
 4    about why the untimely calculation of trades was particularly
 5    egregious at the end of the arbitration.
 6               MR. KNOLL:  May I ask the Court's indulgence just for
 7    one last point on the misrepresentation?
 8               THE COURT:  Okay.
 9               MR. KNOLL:  I'll make this point very quickly.
10               We have to recognize that when Mr. Ackerman decided to
11    go ahead and be barred from the industry for refusing to show
12    up for a subsequent on-the-record interview, that speaks
13    volumes.
14               Now, remember, Mr. Ackerman told the arbitration panel
15    that FINRA told him that he did nothing wrong.  Now, for
16    whatever reason -- and he can say, well, I decided to move to
17    California, and I'm not going to ever be in the securities
18    business again.  But he spent his entire life in the securities
19    business.  And instead of going back and speaking to FINRA --
20    again, even if FINRA told him that there was nothing wrong, he
21    knowingly -- and remember, anybody who decides to not show up
22    for an 8210 request or show up for an OTR is banned.  That just
23    means you're not only banned from being associated with the
24    broker-dealer; you're statutorily disqualified from being
25    associated with an investment adviser.  You can't run a hedge
```

G44eodec

1    fund, too, but be an investment advisor.  He supposedly is

2    trying to run a hedge fun now.  There's all sorts of things

3    that happen as a result of refusing to show up or failing to

4    show up for a requested interview.  That, to me, speaks

5    volumes.

6              Now, on to the fairness point.  The issue here is,

7    again, the calculation of damages in this case or what

8    Mr. Ackerman believed he was owed was at the heart of the case.

9    It's central to it.  Mr. Ackerman on the eve of the hearing --

10   approximately 16 days before, but we'll sort of forgive that.

11   There's a spreadsheet 400 pages that's produced with all sorts

12   of different line items and calculations that we object to, and

13   the firm objects to, prior to the hearing.  But it's permitted

14   to be entered anyway.

15             Then it's followed up with a couple of more revisions

16   because Mr. Ackerman, during his testimony -- you'll see

17   multiple references to this -- he says, I was up all night.  I

18   did seven days of 18-hour days to put together these

19   spreadsheets and revise them, panel, in a way that might help

20   you.  So he does revisions to the calculations again.  And we

21   could even forgive that, if those were done, and there was at

22   least an opportunity to respond to them.

23             But the problem that we have is on the very last day,

24   in the very last hours of the hearing, there's a last

25   spreadsheet that comes in through their expert, Mr. Ricci.

G44eodec

1       Now, this spreadsheet is supposedly some new synthesis, based

2       upon new assessments Mr. Ackerman made the night before.

3               Now, that's presented.  It's handed out as Mr. Ricci

4       is testifying.  It's objected to.  Ms. Pessen, the chair of the

5       panel, says, let's just move on.  All of a sudden now, because

6       we're on the sixth day of the hearing -- we only have six

7       scheduled -- we're choosing expediency over fairness now.

8       Instead of -- as Mr. Roberts, my partner, Stuart Roberts, who

9       was doing the cross-examination of the expert, right before his

10      cross-examination begins, he asks, can I take a break?  Can we

11      just take an hour so we can look at what we have?  Answer:  No,

12      we've got to keep moving.  We're going to get done today.

13      Let's go.  Let's move forward.

14              Now, in some circumstances I could totally understand

15      that.  An arbitration panel has the opportunity and the ability

16      to control its docket.  They could control the course of

17      events.  They have wide latitude.  I completely get it.  But

18      the problem here is if the panel is going to permit the

19      evidence to be presented, it has to understand that there's a

20      burden that goes with that.  There has to be some recognition

21      that there is an -- there must be some opportunity to evaluate,

22      review and then appropriately respond to the evidence.  And

23      that was not given here.

24              Now, we tie that to repeated statements by the chair

25      of the panel that, well, we're not going to focus on the

24

G44eodec

minutiae of the trades.  We don't want to get into the details about the trades.  I understand that, too.  Again, she can tell the panel or she can tell the litigants what she wants them to focus on.

　　　　But then at the end of the day, when an arbitration award comes out that is highly specific -- we're not talking about an award that said, okay, Mr. Ackerman, here's $100,000. We're talking about a highly specific award that we, reviewing this award, have no way of being able to determine, test, understand what the basis was.

　　　　Now, wage claims are wage claims.  They're either earned or they're not.  They're not something that you're just supposed to make up out of thin air.  So we have to assume that the panel based its calculations of what it believed Mr. Ackerman was owed upon their assessment of this material presented to them.  We don't know whether they based it on the first round of spreadsheets, on the second round of spreadsheets or on this final determination.

　　　　All we know is in the last hours of the hearing this was presented.  We asked for an opportunity just to at least stop, take an hour and review it.  That opportunity was not afforded to the petitioners.  And that is alone enough of a reason to vacate the award.  Because, as your Honor understands, it's boilerplate.  The essence of the rule is that there must be a full and fair opportunity to present evidence.

G44eodec

1           THE COURT:  Of course, we don't know that much about

2     how the panel got to their conclusion because they were not

3     required to provide that.  And you bought into that when you

4     promulgated the arbitration clause, yes?

5           MR. KNOLL:  This is an employee matter, so it's FINRA

6     rules that would require us.

7           THE COURT:  Sorry.  But nevertheless, that was

8     implicit in preferring arbitration to alternatives.

9           MR. KNOLL:  No.  Actually, from Odeon's perspective,

10    it's -- because they're a broker-dealer, they're required to

11    arbitrate.  This is not a contractual matter like there are

12    between retail clients and firms where, yes, I completely

13    understand your point there.  The industry decided that retail

14    arbitration was a good thing, right.  And sometimes they're not

15    happy with the results of that.  This is different.  This is an

16    industry arbitration matter that's required under FINRA rules.

17          Now, to the point that you're making there, I

18    completely understand this.  FINRA arbitration panel is not

19    required to provide its rationale for its decision.  I get

20    that.  But it does give us numbers.  It gave us an arbitration

21    award.  And we are expected to at least be able to say that

22    there's some semblance of rationality to it.

23          Now, I don't know where they got the number.  It's

24    strangely specific.  I don't know where it came from.  But if I

25    could look on any of the spreadsheets and tally up my

G44eodec

1    numbers -- and we've raised this from the moment we filed our

2    first petition, if they could show me, here's where the math

3    went.  They decided to -- cut this number and this number.  And

4    they show us where it is.  If they went through that exercise

5    and were able to show some rational basis for the award or some

6    means at which it could have been derived, then at least we

7    would be able to test whether we were given an adequate

8    opportunity to respond to that.  Because I will say, if that

9    award is tied back to this final spreadsheet, we have a very

10   serious problem.

11           THE COURT:  Okay.  So thank you very much.  I will

12   give you a chance to be heard after we hear from your

13   adversary.

14           MR. KNOLL:  Thank you, your Honor.

15           MR. ALOE:  Good afternoon, your Honor.  My name is

16   Paul Aloe.  I was counsel for Mr. Ackerman during this proceed.

17           And I think to start out, what's helpful is to put

18   this entire arbitration in context, because I think the issues

19   that have been raised fall -- are pretty clearly seen when you

20   look at it.

21           Mr. Ackerman commenced an arbitration which at its

22   center had a claim that he was not paid commissions in

23   accordance with contract.  The contract provided him

24   commissions on trades that were his customers.  When he came to

25   Odeon, there was a list of customers that were his in the

G44eodec

papers -- it's Exhibit 2 to my certification.  I know you
struck the certification but not the exhibits.  It was in
evidence.

So it was his position that those were the customers,
much like, you know, somebody comes to a law firm and they say,
these are my clients, and we expect to get -- override on your
clients or something.  That was what the anticipation was.

So there was an analysis -- and there were other
claims in this case as well.  There was a claim that there was
discrimination because of his disability.  That was rejected by
the arbitrators.  There was also a claim that he was terminated
as retaliation for unlawful reasons, because he was complaining
about compensation and asking for accommodation.  That was also
denied.  I will get to it later on about the AWC.  But this
whole issue of the personal trade, to the extent that it's
relevant at all, it's going to be relevant to that claim that
Mr. Ackerman did not succeed on.

At the heart of the claim is a rather simple claim.
There's a contract.  There was a -- he had a list of customers.
As an employer -- they're an employer.  They had a duty to
calculate his wages.  The evidence throughout was that they
never gave him regular statements of what it was.  And
throughout the discovery phase we fought to get their records.
We didn't get their records.  Their claim is -- in center of
the case is --

G44eodec

 1             THE COURT:  As I understand the issue, correct me if

 2    I'm wrong, particularly as counsel has presented it here today,

 3    the heart of their claim on this particular issue is not so

 4    much that there were changes; things were presented late in the

 5    pretrial period and the prehearing period, and there was

 6    changes made and so forth.

 7             The heart of their argument is that there was a final

 8    calculation made.  Let's assume for the sake of argument that

 9    it's because you only got the data late or whatever.  I don't

10    think it's critical.  For whatever reason, there was, through

11    your expert, presented a final revised calculation that may

12    have well been relied on by the arbitrators.  We don't know.

13    And they weren't given the opportunity to meaningfully respond

14    to it, either through just having time to study it or time to

15    meaningfully cross-examine it.

16             So why is that not a problem?

17             MR. ALOE:  Let me address it.  So Mr. Ackerman's claim

18    and his base on the wages is that Exhibit 2 to my declaration,

19    the list of clients that he brought with him, is supposed to be

20    what he was paid on.  And that was the analysis that was

21    presented to them at the 20-day exchange.  Under the rules we

22    have an exchange of documents that we relied on.  So his basis,

23    his theory, is I'm entitled to 4.1 in wages on my customers

24    that under the contract you were supposed to pay me.

25             We show up to the arbitration hearing and they make

29

G44eodec

1    several arguments themselves.  They say, no, no, no, that

2    exchange, that e-mail exchange, that's not relevant.  We decide

3    what -- if you have coverage or not.  And that coverage is in a

4    system called Portal.  They gave us three Portal snapshots.  So

5    there's one in September.  They started in May.  There's one in

6    September, and then they argued that not only that -- and

7    there's two more -- not only that, but we can take them out

8    over time.  And in certain clients, certain clients, they're

9    split.  So certain clients he might have -- get credit.  If

10   it's Joe and the other one, somebody else gets credit.  If

11   it's -- Mr. Schwartzberg gets credit for the rest.

12        So what we did is we had presented the 4.1 all up.  We

13   said, let's assume their arguments.  First, we said, let's

14   assume that they chose which to credit him on the first Portal

15   snapshot.  But I think it's important to understand here,

16   something about this case is that we asked for Portal analysis

17   every day, so we could see it change day by day.  They said --

18   they certify it.  We can't do it.  We made a motion to compel.

19   They file a response that we cannot provide the information

20   they're asking for.  They gave us three shots.

21        So they made the argument at the -- remember, this is

22   an arbitration.  This is not like a trial.  I don't get

23   contention interrogatories or depositions.  I show up and they

24   take their position.  One of their positions is those clients,

25   most of those clients, you didn't get those clients.  And then

G44eodec

1    they take the position that, yeah, we can take them away and we

2    split them.

3            So I ask Mr. Ricci to do -- Mr. Ricci is a Certified

4    Public Accountant.  That's all he is.  He's not here as a fact

5    witness.  He's not here as -- he was there to do math

6    basically.  It was math.  It was math based on what should be

7    in their records.  And we said, okay, let's -- we ran up to --

8    so we had the 4.1 analysis.  And we said, let's assume that

9    they're right, that they only got some of their clients.  So

10   Mr. Ricci -- we had an analysis.  We said, let's assume it's

11   the first Portal snapshot they gave.  That number amounted to

12   $2.7 million.

13           Then we said, let's assume they're right that they

14   took away some of those.  And let's assume that some of the

15   clients weren't -- you know, they didn't get all of them, so we

16   took them all away.  And Mr. Ricci did an analysis on that.

17   And he said on that, on those analyses, including taking

18   clients away that they said were split, the number was 1.5.

19   They gave a number of 1.1, very specific.

20           So they obviously didn't rely on -- they weren't

21   taking anybody's analysis or client sacred.  It's clear, as

22   somebody who went through this arbitration, that the

23   arbitrators focus client by client.  They were very

24   client-focused.

25           A component of this was something called RMBS bonus.

G44eodec

<table>
<tr><td>1</td><td>If you do the math on the final award, it sounds like they took</td></tr>
<tr><td>2</td><td>the RMBS bonus out; because if you take the RMBS bonus number</td></tr>
<tr><td>3</td><td>out, the number comes to about 1.1.  So there's lots of</td></tr>
<tr><td>4</td><td>rational ways that you can do it.  And it's math.  They're the</td></tr>
<tr><td>5</td><td>employer.</td></tr>
<tr><td>6</td><td>        What they should have done -- and there's a comment</td></tr>
<tr><td>7</td><td>from Ms. Pessen, who they're complaining about.  She says, you</td></tr>
<tr><td>8</td><td>chose to litigate this case the way you chose.  They could have</td></tr>
<tr><td>9</td><td>come in and not only made the statement; they could have come</td></tr>
<tr><td>10</td><td>in with their own financial people and said, look, this is how</td></tr>
<tr><td>11</td><td>we did it.  Here's what's in Portal.  Here's how we calculate</td></tr>
<tr><td>12</td><td>it.  He's not sure.  They never did that.  They never presented</td></tr>
<tr><td>13</td><td>that analysis.</td></tr>
<tr><td>14</td><td>        And they had the opportunity after Mr. Ricci</td></tr>
<tr><td>15</td><td>testified -- and by the way, Mr. Ricci finished, it was 11:30</td></tr>
<tr><td>16</td><td>in the morning.  Request for adjournment.  They said, let's</td></tr>
<tr><td>17</td><td>break for lunch.  Palin said, no, let's keep going.  They went</td></tr>
<tr><td>18</td><td>a half hour on Mr. Ricci.  They said, no more questions.  We</td></tr>
<tr><td>19</td><td>went to lunch, came back.  They said -- they asked each side,</td></tr>
<tr><td>20</td><td>does anybody have any more evidence to present?  And each side</td></tr>
<tr><td>21</td><td>said, no, we do not.</td></tr>
<tr><td>22</td><td>        They had every opportunity to present their analysis.</td></tr>
<tr><td>23</td><td>This is their numbers.  These are their views.  We didn't</td></tr>
<tr><td>24</td><td>sandbag them with some theory that was out in left field.  What</td></tr>
<tr><td>25</td><td>we said was, all right, let's take some of your assumptions.</td></tr>
</table>

G44eodec

1   Let's take your testimony.  Your math still doesn't work.

2   That's what they didn't do.

3           And this is not like some expert who comes up with

4   some brand new theory at the last minute that totally changes

5   it.  In theory, Mr. Ricci made no assumptions, by the way.

6   Mr. Ricci made assumptions he was given.  He wasn't telling how

7   to calculate it.  One was, you get all your customers.  That

8   was Exhibit A, which was the e-mail that was exchanged at the

9   time they did it.  One assumption was the first Portal shot,

10  and one assumption was taking every assertion they made and,

11  whenever there is a benefit of the doubt, giving it their way.

12          THE COURT:  All right.

13          MR. ALOE:  I just want to make one more point, because

14  I think it goes to him.

15          I heard him complain about the fact that we don't know

16  how the arbitration, arbitrators made their decision.  The

17  FINRA rules actually allow the parties to ask for a reasoned

18  decision.  Neither side did.  When we came back before we

19  rested, Ms. Pessen said that both sides -- you know, neither --

20  I just want you to know, neither side has asked for a reasoned

21  decision.  So you're going to get a bare decision.

22          So both of us had the opportunity here to do something

23  that you don't usually get in arbitration.  You go to triple A

24  and they don't say, okay, we're going to give you a reasoned

25  award if you want.  Here, the rules actually allowed for a

G44eodec

1    reasoned award.  We didn't ask for a reasoned award, we don't

2    get a reasoned award.  They don't ask for a reasoned award,

3    they don't get it.  It's not just the fact that they're subject

4    to FINRA.  They elected not to have a reasoned award.  And the

5    arbitrators, I mean, there's a lot in their brief about

6    manifest disregard.  And I respectfully submit, this is not

7    even close to -- I don't --

8            THE COURT:  So let's switch gears and talk about the

9    alleged perjury.

10            MR. ALOE:  Okay.  I say "alleged perjury" because we

11   really don't know that it's perjury.  I think --

12            THE COURT:  I agree.  I understand that completely.

13            MR. ALOE:  But it is clearly collateral.  So the

14   argument that they were making, one of the fights here was

15   whether or not the termination of Mr. Ackerman was a result of

16   illegal basis or was the result of other things.  And the other

17   things were he wouldn't talk about an adjustment until an

18   investigation of his was clear.

19            So it's not even -- this is not even really that.

20   This is kind of tangential to that.  There was a allegation

21   that they made that he traded on his personal account and he

22   made excessive profits.  That was one of their allegations.

23   And we showed that that was something that happened all the

24   time and wasn't improper.  And on cross-examination he was

25   asked about this OTR.  He testified to it.  And I think he

G44eodec

1    testified to his understanding that it was closed and it

2    clearly was not material, because we lost on the wrongful

3    termination claim.

4              And your Honor asked a very important question:  What

5    was the follow-up?  There was a lot of point about, well, you

6    know -- your Honor asked, I thought, a really excellent

7    question:  What's the follow-up?  Well, the follow-up is, when

8    they put Matt Van Alstyne on the phone -- 612 of the

9    transcript, 31 of my declaration -- they asked him, and he

10   says, it's not closed.  We got inquiries as recently as a week

11   ago.

12             So to the extent that there's some -- that whether it

13   was closed or open is material, they told the arbitrators that

14   it was still open.

15             And by the way, this OTR request, it's a request that

16   came down, I believe, in January of this year, February -- or

17   last year, after this proceeding was commenced, long after this

18   was closed.  And the only finding, the only determination is

19   that Mr. Ackerman, who's now in California, didn't want to get

20   on a plane and fly to New York.  So that's the only thing the

21   OTR says; that you are required to come, and you didn't come,

22   and you agree as a consequence of that that you are right.

23   There's no finding in this thing, other than the fact that he

24   didn't appear.

25             This is an investigation actually in other trades.

G44eodec

And to the extent that they're arguing that somehow these
trades are relevant?  Maybe -- these were trades on his
personal account.  These weren't trades he made for the firm.

So the argument that this relates to his commissions,
it's got nothing to do with it.  It is not just collateral;
it's irrelevant.  I guess it's collateral to the extent that
you're always -- on cross-examination you get wide latitude to
try to show that the claimant or the witness is not truthful.
And for all I know, I mean, my adversary says, oh, they must
have thought he was truthful.  I don't think they had to
determine that.  I didn't need to determine that from their
records, from the list of clients, from their assertion of who
it is and from their Portal snapshots, that they underpaid him,
which was the claim.

This case, I would respectfully submit, has been fluid
out of their mouth.  And you don't have to find -- I'm not
saying he's incredible, he's incredible or he's not truthful.
I think part of this case was -- is about his battling an
Oxycontin addiction, and coming in and putting that on the
record, which I do think took a lot of courage, to be honest
about that.

But in terms of the wage claim, credibility really --
this is math.  It's straight math.  And their claim is based on
their own assertions.  The assumptions on Mr. Ricci's
bottom-line number, which is the 1.5, which is highly not -- is

G44eodec

1    based on their assumptions, not on our assumptions.

2              So I don't think there's anything -- there's no

3    guesstimate here.  There's nothing wrongful here.  The problem

4    they had is they didn't -- throughout this case, throughout his

5    employment, notwithstanding the provisions of the labor law,

6    which says you have to calculate and you have to give a

7    commissioned salesperson who's an employee, under 195 of the

8    labor law, you're obligated as an employer to give that

9    calculation.

10             And then when we had a case and they said, it's all

11   based on Portal, they didn't give us the Portal information.

12   And then they show up during the hearing, the three Portal

13   snapshots --

14             THE COURT:  Okay.  I did understand your argument, but

15   this time, rather than -- let me hear briefly --

16             MR. ALOE:  Let me just -- I know there are a lot of

17   things that we didn't touch.  But in terms of joint and several

18   liability, it's got nothing to do with the LLC --

19             THE COURT:  Counsel, counsel, I didn't let them argue

20   it.  I'm not going to let you argue it.  Those are important

21   issues.  They all need to be addressed by this Court.  This

22   Court will issue what I'd like to believe would be a reasoned

23   decision.  But because of time constraints, we've got to put

24   those other issues aside.

25             So, thank you very much.  Let me hear --

G44eodec

1                MR. ALOE:  If I can, may indulge one thing --

2                THE COURT:  Go ahead.

3                MR. ALOE:  Because not only were they wrong on the

4       legal fees, because there is a colorable basis.  You couldn't

5       separate out the work.  But I also want to emphasize to the

6       Court that I think under the Labor Law 198(a)(1), that

7       Mr. Ackerman should also be entitled to legal fees for this

8       proceeding.  And that provision says, all attorneys fees.  And

9       there's case law that supports us.

10               So I just want to say that we think we should --

11      obviously I have to submit them to your Honor, but we think

12      that the fees that Mr. Ackerman's been forced to incur in this

13      proceeding should be awarded to him as well.

14               THE COURT:  And here I thought both of you were here

15      just because of your great interest to the development of the

16      law.

17               So let me --

18               MR. ALOE:  It's always great to have development in

19      law, arguing before your Honor, but we do like to get paid as

20      well.

21               MR. KNOLL:  That was our remand motion, your Honor,

22      good development and extension of law.

23               THE COURT:  Let me hear in rebuttal.

24               MR. KNOLL:  So two brief responses to this.

25               When the final spreadsheets were presented, now, if

G44eodec

 1    this was just math, then, one, why are you having Mr. Ricci

 2    come in and testify to this?  He's the one who's now vouching

 3    for these opinions.

 4            Also, Mr. Roberts, my partner in this, right before he

 5    began his cross-examination, said to the panel, look, a lot of

 6    information is being provided, and assumptions that we haven't

 7    had the right or ability to check them yet.  So in other words,

 8    we are asking just to slow down.  That is what we contend was

 9    the problem here.

10            Now, if the arbitration panel would have given one

11    more day, that's fine.  Then we come back and figure out, after

12    everybody's had a chance to review it.  But that isn't what

13    happened here.

14            One point that I would like to make, though, with

15    respect to the misrepresentation --

16            THE COURT:  Why didn't you ask for a reasoned decision

17    if -- given that this had just occurred?  And so now the

18    question that must have been going through your mind is, will

19    this impact the decision?  And you could have found out and,

20    thus, we would have known in a much shorter way than I know now

21    whether it was material or not.  But you didn't.

22            MR. KNOLL:  Two points on that.  First, the amounts of

23    written -- of reasoned decisions that are issued or that are

24    requested, either by the industry or by the claimant's side in

25    FINRA arbitrations, is few and far between.  Yes, it's

G44eodec

something you can ask for, but they are rarely asked for.

          THE COURT:  Yes.  But as I understand it, the chairman

of the arbitration panel reminded counsel that they had that

option right before the end.

          MR. KNOLL:  That's actually part of the FINRA closing

script, your Honor.  Every arbitration panel concludes with

that.

          THE COURT:  And so because it's boilerplate, you

disregard it?

          MR. KNOLL:  Not necessarily.  I'm not saying there

wasn't a reasoned assessment whether or not to ask for a

written decision.  The practice is not to have them because

typically the arbitration award says what it's supposed to say.

And both parties who believe they've been presented with an

opportunity to argue their case understand that that's the

protocol.

          And whether there was a reasoned decision issued here

or not, whatever the number is, whatever the award provides

should be something that we can at least tie back to the

evidence that was presented.  We're not asking for the panel

to --

          THE COURT:  You're telling me you can't.  And you have

some guesses.  Your adversary has some guesses.  But you don't

know how they arrived at that figure.  And, therefore, you

don't know and I don't know to what extent it relied on those

G44eodec

1    last-minute calculations.

2            MR. KNOLL:  Right.  But to be clear, the rule,

3    right -- so in the 1300 series for the FINRA arbitration code,

4    this is the industry code -- actually, applies equally as well

5    to the 1200 series -- parties can request a reasoned decision,

6    right?  There's absolutely nothing that prevents a FINRA

7    arbitration panel from providing reasoned awards on their own.

8    There isn't anything that prevents that.  So simply because it

9    wasn't requested does not mean that the panel could not have

10   provided any reasons that it wanted to.

11           So it is a matter of practice, your Honor, that these

12   things are typically not requested.  Reasoned awards are

13   typically not requested.  But I think that's almost a side

14   issue.

15           THE COURT:  All right.

16           MR. KNOLL:  The central issue really, though, with

17   respect to the damages, are ones we've already stated.  And I

18   won't rehash them here.  I wanted to go back to the

19   misrepresentations.

20           What we would proffer, based upon what we understand

21   with respect to the investigation that was underway, was that

22   when it came to those -- if Mr. Ackerman had been truthful

23   about his testimony -- and I'm going to make this proffer:  I

24   believe that if we were put to the test on this, I would be

25   able to, either through subpoenas or other means, be able to

G44eodec

1  establish this before your Honor, we believe Mr. Ackerman was

2  asked about at least 13 transactions that he participated in in

3  2011.  In connection with certain of those transactions, we

4  believe that the staff asked Mr. Ackerman about

5  misrepresentations Mr. Ackerman made to counterparties in order

6  to increase the amount of commission that he was paid on those

7  transactions.

8        This is a practice -- I'm not sure if your Honor is

9  aware; there's references to this in the transcript to the

10  Jesse Litvak case, which is the Jefferies matter, involving one

11  of their RMBS traders a few years ago currently the subject of,

12  I would say, much interest among the securities bar, and

13  certainly an area of the law that is unsettled in the light of

14  the Second Circuit's reversal of his criminal conviction.

15        But the central issue with the Litvak cases are

16  whether a party to an RMBS transaction or one of these

17  over-the-counter fixed income transactions in an unlit market

18  must be truthful with their counterparties.  In other words,

19  you're not supposed to tell the counterparty that, I bought the

20  bond at 38, when you actually bought them at 34.

21        We believe Mr. Ackerman was asked about some

22  statements that he made that may have been made by him in order

23  to generate additional commission.  Now, if Mr. Ackerman was

24  truthful about the FINRA OTR, then that would have been

25  something that he would have to testify about.  Now, does that

G44eodec

1     go directly to his compensation?  Absolutely.

2            Now, do we know that every trade that he was raising

3     wage claims about were something that he made some

4     misrepresentations to counterparties in?  I have no idea.  I

5     can only say to the Court that my understanding about what

6     Mr. Ackerman was asked about has been formed in the last 30

7     days.

8            Now, that gets us all back to this question of

9     materiality.  Nobody asked Mr. Ackerman to lie.  He did it on

10    his own.  Why?  Because when he's questioned about his trading

11    activity in a way that casts aspersions or casts doubt -- and

12    remember, as the arbitrator, Ms. Lutati asked him the question:

13    What about the status of it?  So FINRA took no action?

14           And in response to those questions, he did not tell

15    the truth.  And that affected the entire proceeding.

16           THE COURT:  All right.

17           MR. ALOE:  I just wanted -- the -- the proffer is a

18    new matter.  So he wasn't asked about Litvak or those trades.

19    That's -- you know, they have a wide latitude for

20    cross-examination.  And if they thought that was a subject of

21    cross-examination, they had an opportunity to cross-examine.

22           Their allegation is about the personal trades.  Then

23    all of a sudden now at this hearing, they switch it around.

24    They said, well, there's something else.  The answer to that is

25    if they really thought that was material, that's a topic they

G44eodec

1   should have included in cross-examination.  They didn't.

2              THE COURT:  All right.  Well, I want to thank both

3   counsel.  This was a very helpful argument.  And the Court will

4   take the matter sub judice.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25